**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| TREVOR SELL, derivatively on behalf of TWIST BIOSCIENCE CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> EMILY M. LEPROUST, JAMES M. THORBURN, WILLIAM BANYAI, ROBERT CHESS, NELSON C. CHAN, KEITH CRANDELL, JAN JOHANNESSEN, ROBERT RAGUSA, MELISSA A. STAROVASNIK, and PATRICK WEISS, <br><br> Defendants, <br><br> and <br><br> TWIST BIOSCIENCE CORPORATION, <br><br> Nominal Defendant. | Case No. 1:25-cv-01380-MN |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

# TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE ACTION ............................................................. 1

II.     JURISDICTION AND VENUE ................................................................................... 14

III.    THE PARTIES ............................................................................................................. 15

IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS ..................................................... 17

V.      FACTS ......................................................................................................................... 22

        A.      The Apparent Success of Twist's Business Revolved Around the
                Purportedly Efficient and Effective Production of Synthetic DNA and
                DNA Products ................................................................................................... 22

        B.      The IPO and Five Secondary Offerings Collectively Raise Over
                $1 Billion in Proceeds ...................................................................................... 26

                1.      The October 31, 2018 IPO .................................................................... 26

                2.      January 27, 2020 Offering .................................................................... 26

                3.      February 19, 2020 Offering .................................................................. 27

                4.      June 3, 2020 Offering ........................................................................... 27

                5.      December 2, 2020 Offering ................................................................... 27

                6.      February 10, 2022 Offering .................................................................. 28

        C.      Relevant Accounting Principles ....................................................................... 28

        D.      The Extensive Confidential FE Accounts in the Securities Complaint ............... 34

                1.      FE-1's Account ..................................................................................... 34

                2.      FE-2's Account ..................................................................................... 45

                3.      FE-3's Account ..................................................................................... 51

                4.      FE-4's Account ..................................................................................... 56

                5.      FE-5's Account ..................................................................................... 60

                6.      FE-6's Account ..................................................................................... 61

E.      The 2020 Registration Statement and Related Public Offerings .......................... 64

      1.      The December 2020 Offering .......................................................... 65

      2.      The February 2022 Offering ........................................................... 66

      3.      False and Misleading Statements Regarding Gross Margins and
           Related Financial Metrics in the 2020 Registration Statement .................. 67

F.      False and Misleading Statements Regarding Twist's Products in the 2020
      Registration Statement ............................................................................. 69

G.      Other False and Misleading Statements Regarding Twist's Products During
      the Relevant Period ................................................................................. 77

H.      The Truth Emerges ................................................................................. 82

I.      The Sustained Securities Action .............................................................. 84

J.      Internal, Board-Level Documents Confirm the Individual Defendants'
      Knowledge of the Misconduct Described Herein ................................. 86

VI.     DAMAGES TO TWIST ...................................................................................... 93

VII.    DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS ...................................... 93

A.      Demand Is Excused as to Defendants Leproust, Chan, Chess, Crandell,
      Johannessen, Ragusa, and Starovasnik, Because They Were Aware of
      the Serious Misconduct Alleged in the Securities Action and the Scorpion
      Report and Failed to Act .......................................................................... 94

B.      A Majority of the Board Members Face a Substantial Likelihood of Liability
      for Knowingly Issuing False and Misleading Statements to Stockholders,
      Including SEC Filings They Signed .......................................................... 97

C.      Defendant Leproust Is Interested and Lacks Independence ................................. 98

COUNT I
Breach of Fiduciary Duty Against the Individual Defendants ...................................... 99

COUNT II
Unjust Enrichment Against the Individual Defendants ............................................... 100

COUNT III
Against the Individual Defendants for Violations of § 10(b)
of the Exchange Act and Rule 10b-5 ........................................................................... 100

PRAYER FOR RELIEF ............................................................................................. 102

Plaintiff Trevor Sell ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Twist Bioscience Corporation ("Twist" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy the Individual Defendants' (defined herein) non-exculpable breaches of fiduciary duties and unjust enrichment.

Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Twist with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, including the partially-sustained federal securities fraud class action against Twist in the U.S. District Court for the Northern District of California captioned *Peters v. Twist Bioscience Corporation, et al.,* Case No. 5:22-cv-08168-EJD (the "Securities Action"), matters of public record, and a pre-suit inspection of certain non-public corporate books and records pursuant to 8 *Del. C.* § 220 ("§220"). Plaintiff's inspection demand pursuant to §220 is incorporated herein by reference.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought for the benefit of nominal defendant Twist against the Individual Defendants, certain current and/or former officers and directors of the Company, based on their non-exculpable breaches of fiduciary duty and other serious misconduct from December 20, 2018 through November 15, 2022 (the "Relevant Period"), as alleged in detail herein.

2.      Founded in 2013, Twist is a biotechnology company built around deoxyribonucleic acid ("DNA") synthesis technology that the Company's co-founder and longtime Chief Executive

Officer ("CEO"), defendant Emily M. Leproust ("Leproust"), reportedly stole from her former company. As alleged in the partially-sustained Securities Action,[1] internally at Twist, defendant Leproust readily admitted that when she founded the Company, she "took all the ideas" that her prior company, Agilent, had been working on for years. It has been alleged that defendant Leproust frequently described Agilent's lawsuit against her for this theft, and the settlement she was forced to pay to resolve it, as simply "the cost of doing business."

3. Although the original technology allegedly stolen by defendant Leproust allowed Twist to produce diverse DNA, this market was inherently a "niche" market because buyers needed just "a couple of pieces for experiments." To create the impression that Twist could serve a larger and more diverse market, and to support Twist's high valuation, the Individual Defendants announced a new suite of DNA products. In particular, the Company focused on two product types, synthetic DNA[2] and Next Generation Sequencing ("NGS") tools,[3] that together accounted for between 80% and 100% of Twist's revenues during the Relevant Period.

4. The Individual Defendants impressed stockholders and analysts during the Relevant Period by repeatedly claiming that Twist earned significant gross margins on the sale of

---

[1] The operative complaint in the Securities Action (the "Securities Complaint") was filed on October 11, 2023 and the allegations therein are based in part on the detailed accounts provided by six former employees of the Company ("FEs"). All the FE accounts referenced herein appear in the Securities Complaint.

[2] Synthetic DNA refers to genes made by Twist utilizing artificial gene synthesis. Unlike DNA synthesis in living cells, artificial gene synthesis does not require template DNA, allowing virtually any DNA sequence to be synthesized in the laboratory.

[3] NGS is a technology for determining the sequence of DNA or ribonucleic acid ("RNA") to study genetic variation associated with diseases or other biological phenomena. Introduced for commercial use in 2005, this method was initially called "massively-parallel sequencing," because it enabled the sequencing of many DNA strands at the same time, instead of one at a time as with traditional Sanger sequencing (a method for determining the nucleotide sequence of a DNA segment, also known as the chain-termination method).

these products. The Individual Defendants represented that Twist accomplished this through, among other things, highly mechanized and automated production processes and "scalable commercial infrastructure," which resulted in the "lowest industry error rate[s]" and faster delivery times, as well as generating high customer satisfaction. Indeed, defendant Leproust boasted, "We have actually perfect quality, we ship perfect DNA."

5. The Individual Defendants concealed from stockholders, however, the Company's true business strategy: to attempt to sell early version products (which defendant Leproust called "V1" or "beta") to quickly generate revenue, even though these low-quality products were unprofitable. Internally, defendant Leproust told her staff the goal was to "get [the product] out, even if it was just one time revenue, it was still revenue." Rather than having "automated [Twist's] entire workflow" or achieved the "the lowest industry error rate," as the Individual Defendants represented to stockholders, defendant Leproust's internal slogan was "good enough is good enough," and she told Twist employees that, "[i]f you have to do it manually, it is okay. We just want [the product] out." Defendant Leproust repeated her slogan so often that employees made T-shirts featuring her tag line as a "bad joke." The shirts said: "Good enough is good enough."

6. In reality, as the Individual Defendants were aware, Twist did not and could not produce its products profitably. This was because Twist's technical staff was heavily relied on to constantly intervene manually in the manufacturing process. These expensive manual processes generated inconsistent, error-prone products with slow delivery times. As a result, customer complaints flooded in.

7. During the Relevant Period, these true facts were concealed from stockholders in two key ways: ***First***, the Individual Defendants caused or permitted the artificial inflation of Twist's gross margins as a percentage of revenue ("Gross Margins")—which they told

stockholders was a "key metric" for the Company—through improper classification of the costs incurred to produce its existing commercial products (*i.e.*, cost of revenues) as research and development ("R&D") expenses. Gross Margins are calculated by deducting cost of revenue from total revenue and can be presented as a percentage of total revenue (*i.e.*, (revenue – cost of revenue)/revenue). Through Twist's standing policy on production costs, employees were improperly instructed to categorize production costs for existing products as R&D. This improper classification violated U.S. Generally Accepted Accounting Principles ("GAAP") and allowed for the artificial inflation of Twist's Gross Margins by reducing the cost of revenue that would be deducted from total revenue. In other words, the improper classification of expenses that were truly part of the cost of revenue as R&D expenses artificially decreased the cost of revenue, and thus artificially increased the "key metric" of Gross Margins.

8. ***Second***, the Individual Defendants misrepresented the efficiency and effectiveness of Twist's production process. While the Individual Defendants told stockholders of error rates of 1:3000 or 1:2000, in truth error rates were closer to 1:10, as data had been cherry-picked from manipulated and artificial parameters to generate false error rates. When the Individual Defendants told stockholders that "[t]he customer experience is excellent," they failed to disclose rampant customer complaints about, among other things, empty "containers that did not have the product," genes where the "DNA was the wrong sequence," and products infected with cross-contamination. When the Individual Defendants told stockholders that they had "automated [Twist's] entire workflow using proprietary and over-the-counter laboratory equipment," in truth there were many human touchpoints in the production processes, which resulted in errors, delayed turnaround times, and other production problems, such as contaminations that periodically shut down Twist production labs. In short, Twist did not have an automated efficient production process (as the

Individual Defendants represented to stockholders), but had to employ laborious, expensive, time-consuming manual processes to make its products. And the few automated processes that Twist did have in place consistently failed. As a result, the Company had high error rates and turnaround times. But the Individual Defendants told stockholders and analysts a different story, touting non-existent highly efficient automated systems using cherry-picked data.

9.      As alleged in the Securities Complaint based in part on the six detailed confidential FE accounts (referenced herein), defendant Leproust and other top Company insiders were intimately aware of these problems. They received reports outlining the extent of the problems and were present in meetings when the issues were discussed. In monthly internal meetings, defendant Leproust presented an "internal only set of slides" with information that either contradicted or was omitted from the Individual Defendants' public statements about Twist's production issues and "other types of breakdowns." Defendant Leproust also admitted in these monthly meetings that the Company's high error rate was 10%, not the 0.013-0.033% error rate the Individual Defendants touted publicly. As to customer complaints, defendant Leproust instructed Twist's Senior Application Scientist to never admit Twist's products had failed because Twist was "the top dog," "doing great," and employees "shouldn't talk about these problems," which contradicted the image of Twist that defendant Leproust and the other Individual Defendants had presented publicly. As alleged in the Securities Complaint, the FE accounts therein speak to "hundreds" of conversations with defendant Leproust about these issues.

10.      Based on their false and misleading statements and omissions, the Individual Defendants launched Twist's October 2018 initial public offering ("IPO") and five subsequent public stock offerings during the Relevant Period, which together raised more than *$1 billion* in proceeds, with Twist's stock price reaching over $207 per share at its height during that timeframe.

11.     The pressure on defendant Leproust to keep up appearances became overwhelming. In one candid moment shortly before these significant issues were finally exposed, defendant Leproust **admitted** at a conference that she concealed Twist's significant issues from stockholders: "If you are CEO, one thing I didn't know is that is the loneliest job in the world because things don't go well most of the time. You can't tell your team. ***You can't tell your investors***. And so you really have the weight of the world on you and you're sitting laying in bed at four in the morning saying 'what did I do; how can I get myself out of this.'"

12.     The Individual Defendants' false and misleading statements and omissions eventually came to light on November 15, 2022, in a report (the "Scorpion Report") released by Scorpion Capital ("Scorpion"), which disclosed, among other things, that: (i) Twist's Gross Margins were inflated; (ii) Twist's flawed manufacturing process was being covered up; (iii) Twist's products suffered quality control problems and high error rates; (iv) Twist suffered poor turnaround times; and (v) Twist suffered significant customer complaints. As a result of these revelations, Twist's stock price dropped by ***20%*** in one day. Over the next three days, Twist's stock price continued to plummet, closing at a two-year low of $24.81 per share. This three-day decline represented a loss in value of almost ***35%*** following the publication of the Scorpion Report.

13.     As a result of these events, the Securities Action was filed in the Northern District of California in December 2022. The operative Securities Complaint, based in part on six confidential FE accounts, was subsequently filed on October 11, 2023 against Twist and defendants Leproust and James M. Thorburn ("Thorburn"), the Company's former Chief Financial Officer ("CFO"). The Securities Complaint asserted fraud-based claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of investors who purchased or acquired Twist shares during the "Class Period" of December 20, 2018 through

November 15, 2022, as well as strict liability and negligence claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of purchasers in certain of Twist's public offerings.

14. The defendants to the Securities Action moved for dismissal after the filing of the Securities Complaint. On September 3, 2025, however, U.S. District Judge Eumi K. Lee ("Judge Lee") sustained the Securities Complaint in material part. Specifically, Judge Lee: (a) sustained claims under Section 10(b) of the Exchange Act against Twist and defendant Leproust; (b) partially sustained claims under Section 20(a) of the Exchange Act against defendants Leproust and Thorburn; (c) partially sustained claims under Section 11 of the Securities Act against Twist and defendants Leproust and Thorburn; and (d) partially sustained claims under Section 15 of the Securities Act against defendants Leproust and Thorburn.

15. Among other things, in sustaining the Securities Action in significant part, Judge Lee concluded that the Securities Complaint adequately alleged that Twist investors were misled based on certain public statements during the Class Period regarding Twist's production, manufacturing, and product capabilities ("Product Statements"), as well as statements about Twist's financial metrics and results ("Financial Metrics Statements"). With respect to certain of the Product Statements that Judge Lee concluded were sufficiently alleged to have been false and misleading, Judge Lee further determined that as to defendant Leproust, there was "***a strong inference of scienter***" based on certain of the FE accounts in the Securities Complaint.

16. Via his pre-suit inspection demand issued pursuant to §220, Plaintiff has obtained Board-level, non-public Company documents (the "Production") which are highly relevant to the factual allegations and claims asserted against the Individual Defendants herein.[4] The Board-level,

---

[4] References to the documents produced by Twist in the Production pursuant to §220 is in the following format: TWIST-SELL-XXXXX.

non-public evidence which Plaintiff obtained from the Company supports Plaintiff's allegations, among other things, of knowing misconduct by a majority of the current members of the Board.

17.     For example, the Individual Defendants continually received updates regarding ████████████████████████ at Board meetings during the Relevant Period.[5] One of these updates was even delivered by defendant ████████████████████████████████ ████████████████████████████ in the allegations regarding inflated gross margin in the Securities Complaint, as he allegedly directed Twist employees to tag costs as R&D instead of cost of revenue. Additionally, some of these updates also included ████████████ ████████████████████.

18.     Additionally, after the Board received an update regarding ████████ ████████████████████████████████████████████████████ ████████████████████████.

19.     Moreover, some of the minutes of meetings of the Board during the Relevant Period even directly referenced ████████████████████████████████████ ████████████████ meeting of the Board, the Board received an update ████ ████████████████ ████████████████████████████████████████████████.

20.     Subsequently, at the ████████████ meeting of the Board, the Board was updated ██ ██████████████████████████████████████████████████.

---
[5] ████████████████ ████████████████ ████████████████ ████████████
████████████████████████████████████████████████
████

[6] ████████████████ ████████████████ ████████████████ ████████████
████████████████████████████████████

[7]     ████████████████ (emphasis added).

[8]     ████████████████ (emphasis added).

█████████████████████████████████████████████████████ Additionally, at this Board meeting, the Board members also were informed ███████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████

21.     Then, at the ███████████ meeting of the Board, the Board received a report ███ ███████████████████████████████████████

22.     Additionally, the Board's Audit and Risk Committee (the "Audit Committee") continually received updates regarding the Company's quarterly and annual financial performance which, among other things, included a review of ██████████████████████████████ The ████████████████ Audit Committee meeting minutes reflect a review of ████████████

23.     As such, during the Relevant Period, the Board consistently reviewed ███ █████████████████████████████████████████████████ █ Thus, the Individual Defendants were continually apprised ████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████

24.     The only references in the Production to actions by the Board ████████████████ █████████████████████████████████████████

9  ███████████████████████ (emphasis added).

10  ███████████████████████ (emphasis added).

11  ███████████████████████ (emphasis added).

12  ████████████████████████████████████████████████ ██████████████████████████████████████

13  ███████████████████

██████████████████████ Yet, nothing in the Production ████████████████

████████████████████████████ In fact, there is nothing in the Production

█████████████████████████████████████████████

25. The Board only leaped into action after the Scorpion Report was published. And, when it did, it rushed to ██████████████████████████████████

█████████████████

26. Specifically, the Board formed a ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ ███████████████████

███████████████████████████████████████████████

██████████████████████ Additionally, the Audit Committee ████

███████████████████████████████████████████ █

████████████████████████████████ █

27. ████████████████████████████████████████

---

[14] ██████████████████████████████

[15] ██████████████████████████████

[16] ████████████████████

[17] ████████████████████████████████████████████████████████████████████████████████████████████████████████████
████████

[18] ████████████████████



██████████████████████████████████████

████████████████████████████

28.     ████████████████████████████████████

██████████████████████████████████████

████████████████████████ At this meeting, ████████████

██████████████████████████████████████

████████████████████ ██████████████████████████

████████████████

29.     This is curious as ████████████████████████████

████████████████████████████ This sort of conflict raises doubt, at minimum,

██████████████████████████████████████

especially when Orrick was and is responsible for defending the Company and defendants Leproust and Thorburn in the Securities Action. Illustratively, the law firm Seyfarth Shaw LLP ("Seyfarth") published a post in 2017 titled, "Internal Investigations Special Committees Resource" which advised that counsel to a special committee conducting an internal investigation "represent *only the committee and not the company or the full board of directors*."[23] Seyfarth

---



[19]    ████████████████████████

[20]    ██████████████████████

[21]    ████████████████████████

[22]    ██████████████████████████████

[23]    https://corpgov.law.harvard.edu/2017/07/06/internal-investigations-special-committees-resource/#:~:text=Legal%20Counsel,-The%20committee%20should&text=Committee%20counsel%20should%20represent%20only,potential%20target%20of%20the%20investigation. (emphasis added).

additionally stated that counsel retained by a special committee "should not be the company's regular outside counsel."[24]

30.     In fact, this engagement of Orrick as defense counsel in the Securities Action, while



defending the Company and those individuals who are named defendants in the Securities Action, such as defendant Leproust, as to whom Judge Lee has found "*a strong inference of scienter*". This tension not only renders the ████████████████

███████████████████████████████████████

██████████████

31.     Later at the ███████████████████████████ the members were provided with ████████████████████████████████

████████████████████████████ ████████████████

█████████████████

32.     ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

33.     Subsequently, ████████████████████████████████

[24]    *Id.*

[25]    ████████████████████████████

[26]    ██

[27]    ████████████████████████████████████████

██████████████████████████████████████████ The minutes reflect that

███████████████████████████████████████████ In
the span of █████████████████████████████████████████████

████████████████████████████

34.     Within the Production, there is no detail on ███████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ Indeed, ███████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████

35.     Moreover, as has been alleged in the Securities Action, the Individual Defendants have never refuted the allegations in the Scorpion Report in detail. All that was ever offered as a repudiation was a simple Company press release which stated that the Scorpion Report "is highly misleading, with many distortions and inaccuracies" and that "[u]nlike the author of the short-seller report, Twist is a public company, and is committed to communicating truthfully, creating value for all shareholders, and being good stewards of capital."[30] This is despite ███████████

██████████████████████████████████████████████████████

███████████████████████████████████████

36.     As such, the Production shows that: (1) the Individual Defendants, including Board

---

[28] ████████████████████████████

[29] ████████████████████████████

[30]     https://investors.twistbioscience.com/news-releases/news-release-details/twist-bioscience-addresses-misleading-short-seller-report.

[31] ████████████████████████████

members, ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ (2) the Board ██

████████████████████████████████████████████████████████

(3) the Company's outside ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ (5) the

Production ██████████████████████████████████████████████

████████████

37.     Stockholders are entitled to honest and accurate information from Twist's directors and officers. The Individual Defendants fell far short of meeting their non-exculpable fiduciary obligations of loyalty and good faith to the Company and its stockholders, giving rise to this derivative action.  Accordingly, Plaintiff seeks to recover for the Company damages caused to Twist by the Individual Defendants' non-exculpable breaches of fiduciary duties.

## II.      JURISDICTION AND VENUE

38.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Exchange Act over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

39.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

40.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

41.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

42.     Venue is proper in this forum because pursuant to 28 U.S.C. §§ 1391 and 1401 because nominal defendant Twist is incorporated in this District and conducts business in this District.

### III.     THE PARTIES

**Plaintiff**

43.     Plaintiff is a current holder of Twist common stock and has continuously held Twist common stock since November 2018.

**Nominal Defendant**

44.     Nominal defendant Twist, a biotechnology company, is a Delaware corporation which maintains its corporate headquarters in South San Francisco, California. The Company's common stock trades on NASDAQ under the ticker symbol "TWST." Twist issued common stock pursuant to multiple public offerings throughout the Relevant Period, including on December 2, 2020 (the "December 2020 Offering") and February 10, 2022 (the "February 2022 Offering") pursuant and/or traceable to Twist's Registration Statement on Form S-3 filed on June 3, 2020, including a preliminary prospectus with the same date (the "2020 Registration Statement").

**Individual Defendants**

45.     Defendant Leproust is one of Twist's co-founders and has served as Twist's CEO and as a member of the Board since 2013. Defendant Leproust also has served as Chair of the Board since 2018, and formerly served as President of the Company from 2013 until October 2022. Prior to co-founding Twist, defendant Leproust served in various positions at Agilent. As discussed herein, certain claims for violation of the federal securities laws against defendant Leproust, based

on substantially similar allegations to those asserted herein, have been sustained in the Securities Action. Further, according to the Company's most recent Annual Proxy Statement filed with the SEC and disseminated to stockholders on January 6, 2025, the Board has determined that defendant Leproust is not an independent director.

46.     Defendant Thorburn served as the Company's CFO from April 2018 until January 2024, when he transitioned into a "Strategic Advisor" role pursuant to his employment agreement with Twist. Defendant Thorburn's employment agreement at Twist terminated on October 1, 2024. Since October 2024, upon information and belief, defendant Thorburn has continued to work for the Company on a month-to-month basis in a paid consultant role. As discussed herein, certain claims for violation of the federal securities laws against defendant Thorburn, based on substantially similar allegations to those asserted herein, have been sustained in the Securities Action.

47.     Defendant William Banyai ("Banyai") is one of the Company's co-founders.  Upon information and belief, defendant Banyai served as a member of the Board from 2013 until 2024. Defendant Banyai also previously served as Twist's Senior Vice President ("SVP") of Advanced Development and General Manager of Data Storage from January 2020 until April 2025, and as Twist's COO from April 2013 until January 2020.

48.     Defendant Weiss served as Twist's COO from January 2020 until September 2022. Defendant Weiss joined the Company in 2014 and held several different positions before becoming Twist's COO in 2020.

49.     Defendant Chess has served as a member of the Board since 2014 and as Twist's Lead Independent Director since October 2018.

50.     Defendant Chan has served as a member of the Board since May 2019, and also serves as a member of the Company's Audit Committee.

51.     Defendant Crandell has served as a member of the Board since 2013.

52.     Defendant Johannessen has served as a member of the Board since October 2018, and also serves as Chairperson of the Audit Committee.

53.     Defendant Robert Ragusa ("Ragusa") has served as a member of the Board since 2016, and also serves as a member of the Audit Committee.

54.     Defendant Melissa A. Starovasnik ("Starovasnik") has served as a member of the Board since August 2021.

55.     Defendants Leproust, Thorburn, Banyai, Weiss, Chess, Chan, Crandell, Johannessen, Ragusa, and Starovasnik are collectively referred to herein as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

56.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interests or benefit.  Each director and officer owed to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

57.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

58.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

59.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

       a.      manage, conduct, supervise, and direct the business affairs of the Company in accordance with all applicable laws;

       b.      neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

       c.      establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

       d.      neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.     ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.     remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with applicable laws.

60.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

61.     The members of Twist's Audit Committee owe specific duties to Twist under the

Company's Audit and Risk Committee Charter (the "Audit Charter"). According to the Audit

Charter, the Audit Committee's purpose is:

> [t]o oversee the accounting and financial reporting processes of the Company and
> audits of its financial statements, the effectiveness of the Company's internal
> control over financial reporting and to make such reports as may be required of an
> audit committee under the rules and regulations promulgated under the Securities
> Exchange Act of 1934, as amended (the "Exchange Act"), including without
> limitation the Audit Committee report to stockholders for inclusion in the
> Company's annual proxy statement…[t]he Committee also reviews and assesses
> the Company's processes to manage and control risk, except for risks assigned to
> other committees of the Board or retained by the Board.

62.     Among other things, the Audit Charter charges the members of the Audit

Committee with the following duties and responsibilities:

> •      Review and discuss with management, on a periodic basis, the Company's
> practices with respect to risk identification, assessment, monitoring and risk
> management and mitigation, with an emphasis on significant business risks of the
> Company, including financial, privacy, operational, compliance, physical security,
> legal and other key business risks, except as to those risks for which oversight has
> been assigned to other committees of the Board or retained by the Board;

> •      Oversee the integrity of the Company's financial statements and monitor the
> Company's accounting practices and reporting;

> •      Meet with management and the independent auditor to discuss the annual
> financial statements, including Management's Discussion and Analysis of Financial
> Condition and Results of Operations contained therein, and the report of the
> independent auditor with respect to such annual financial statements and to discuss
> significant issues encountered in the course of the audit work, including:
> restrictions on the scope of activities; access to required information; the adequacy
> of internal controls, including any special steps adopted in light of any significant
> deficiencies or material weaknesses in the design or operation of internal control
> over financial reporting identified during the course of the annual audit, and the
> adequacy of disclosures about changes in internal control over financial reporting;
> the adequacy of the disclosure of off-balance sheet transactions, arrangements,
> obligations and relationships in reports filed with the SEC; and the appropriateness
> of the presentation of any non-GAAP financial measures (as defined in the
> Regulations) included in any report filed with the SEC or in any public disclosure
> or release;

• Review and discuss with management and the independent auditor, if any, management's report on internal control over financial reporting, and any independent auditor's audit of the effectiveness of the Company's internal control over financial reporting and its attestation report, prior to the filing of the Company's annual report on Form 10-K (the "Form 10K") with the SEC;

• Following such review and discussions, if so determined by the Committee, recommend to the Board that the annual financial statements be included in the Company's annual report on Form 10-K.

• Generally review and discuss the Company's earnings press releases, as well as any financial information and earnings guidance provided to analysts and rating agencies.

• Discuss with management and the independent auditor the quarterly financial statements prior to the filing of each of the Company's quarterly reports on Form 10-Q, including Management's Discussion and Analysis of Financial Condition and Results of Operations contained therein.

• Periodically conduct separate executive sessions with management, the internal auditor, if any, and the independent auditor to discuss matters that any of them or the Committee believes could significantly affect the financial statements and should be discussed privately; and review with the independent auditor any audit problems or difficulties and management's response.

• Conduct or authorize such inquiries into matters within the Committee's scope of responsibility as the Committee deems appropriate.

63.    Twist further maintains a Code of Ethics and Business Conduct (the "Ethics Code"), which expressly applies to all directors and employees of the Company (among others collectively defined in the Ethics Code as "Twist Workers"), and therefore to all the Individual Defendants.  The Ethics Code requires, among other things:

• Compliance with both the letter and spirit of all applicable laws, rules, and regulations. No Twist Worker shall commit an illegal or unethical act or instruct others to do so for any reason.

• Twist Workers must strive to ensure that all information transmitted, both within and outside the Company, is honest and well-founded; misrepresentation of information to create a misleading business picture is not permitted. Twist Workers must never withhold or fail to communicate information that should be brought to the attention of any level of management, or intentionally falsify records, including digital copies and computer records. All Company accounts, financial reports,

research reports, marketing information, sales reports, competitive bids, requests for proposals, tax returns, expense accounts, time sheets, claims and any other Company documents, including those submitted to governmental agencies, must be accurate. All entries on the Company's books and records must represent, and not conceal, the true nature of each transaction. Company reports and documents filed or submitted to any governmental authority (including, if applicable, the Securities and Exchange Commission, the Food and Drug Administration and the Internal Revenue Service) and any public communications shall include full, fair, accurate, timely and understandable disclosure.

## V.    FACTS

### A.    The Apparent Success of Twist's Business Revolved Around the Purportedly Efficient and Effective Production of Synthetic DNA and DNA Products

64.    Founded in 2013, Twist is a biotechnology company that manufactures synthetic DNA and DNA products. During the Relevant Period, the Individual Defendants caused Twist to report revenue from five types of products: (1) synthetic DNA (sometimes referred to by the Individual Defendants as "genes" or "oligos"); (2) NGS tools, or next generation sequencing tools (mainly "custom panels," "probes," and "oligo pools"); (3) DNA and biopharma libraries; (4) antibody discovery services; and (5) DNA data storage.

65.    Twist's two key products, synthetic DNA and NGS tools, accounted for between 80% and 100% of the Company's revenues during the Relevant Period. Synthetic DNA enables scientists to create DNA molecules of DNA sequences without a template. Construction begins with the base-by-base synthesis of oligonucleotides, followed by assembly into double-stranded DNA fragments. These custom DNA fragments can be used directly, cloned into vectors, or assembled into larger constructs to serve a variety of research uses.

66.    Twist's synthetic DNA products are sold as clonal genes and non-clonal genes. Clonal genes are verified sequences of genetic material produced according to customers' specifications. Non-clonal genes are gene fragments that are not sequence-verified and can be used by customers to build the genes they need for research or other purposes.

67.     NGS is a technology for determining the sequence of DNA or RNA to study genetic variation associated with diseases or other biological phenomena. Specifically, this technology enabled the sequencing of many DNA strands at the same time, instead of one at a time as with traditional or "legacy" methods. Twist began offering NGS tools to customers in February 2018. Throughout the Relevant Period, Twist sold a variety of NGS tools, including DNA panels, probes, and NGS kits.

68.     Underlying these product lines is Twist's DNA synthesis technology. The Individual Defendants described this technology in each of Twist's Annual Reports filed on SEC Form 10-K from 2018 through 2022 as the "core" of the Company's business model and claimed that Twist had "proprietary technology that pioneer[ed] a new method of manufacturing synthetic DNA by 'writing' DNA on a silicon chip." According to the Individual Defendants, Twist's breakthrough proprietary "chip" allowed it to produce synthetic DNA at "high levels of quality, precision, automation, and manufacturing throughput at a significantly lower cost than their competitors." The Individual Defendants also told stockholders this "chip" allowed Twist to "miniaturize the chemistry" necessary for DNA synthesis, and claimed it was this revolutionary technology that allowed Twist to sell its synthetic DNA products at high gross margins despite offering prices well below its competitors.

69.     The Individual Defendants sought to differentiate Twist from its competitors by touting its gross margins and profit-generating product lines. The Individual Defendants told stockholders and analysts that although the Company had yet to see profits, it earned a comfortable gross margin on every sale and that Twist did not sell products below cost. When questioned about the discounts Twist offered, defendant Leproust stated on May 5, 2022, during Twist's earnings conference call for the second quarter of 2022 (the "2Q 2022 Earnings Call"), that "there's

definitely a red line where any deal has to pay for our cost, right? So the bare minimum. We're not going to do a deal that's not a gross margin positive."

70.    The Individual Defendants further emphasized the Company's focus on gross margins and that metric's importance to Twist's financial well-being. For example: (a) on February 7, 2019, defendant Leproust told stockholders during the Company's earnings conference call for the first quarter of 2019 (the "1Q 2019 Earnings Call") that "[n]ow [the Company] will focus on improving overall operations efficiency to improve our gross margin"; (b) during the December 5, 2019 Evercore ISI Healthcare Conference, defendant Thorburn told stockholders that "the other key metric we look at is gross margin"; (c) during the Company's earnings conference call for the fourth quarter of 2019 (the "4Q 2019 Earnings Call") on December 11, 2019, defendant Leproust told stockholders that "operationally, we will continue to focus on increasing our gross margin, reducing turnaround time"; (d) during the January 15, 2020 JPMorgan Healthcare Conference, defendant Leproust said that "[L]ast year was a key year for us because the first time that we broke gross margin breakeven"; and (e) on June 2, 2020, at the Jefferies Virtual Global Healthcare Conference, defendant Leproust said that "very important for us is the focus on gross margin."

71.    In light of this clear emphasis on gross margins, it was a key metric during the Relevant Period for stockholders and analysts. This was reflected in analyst reports throughout the Relevant Period, which, for example, noted that gross margins were listed first in the Company's goals for 2020 (Cowen, October 18, 2019); included gross margins in "key financial modeling" (Evercore, May 31, 2019); and proclaimed that "the future for TWST remains bright" due in part to "scaling gross margins" (Cowen, February 6, 2020).

72.    The Individual Defendants also touted the effectiveness and efficiency of Twist's manufacturing capabilities. The Individual Defendants told stockholders that Twist made synthetic

DNA with the "lowest industry error rate of 1:3000 base pairs . . . and customizable set of oligo pools . . . with an error rate of 1:2000 nucleotides." Later in the Relevant Period, the Individual Defendants claimed that the error rate improved further, to just 1:7500 base pairs. Moreover, these error rates supposedly represented the errors that occurred during production but that were ultimately caught by Twist's quality control ("QC") process. For the products that were shipped to customers, defendant Leproust claimed that the Company only shipped "perfect quality" or errorless DNA, and repeatedly boasted, "We have actually perfect quality, we ship perfect DNA."

73.     The Individual Defendants further distinguished Twist by emphasizing its turnaround times, that is, the time it takes to deliver the Company's product after receiving an order from a customer. The Individual Defendants claimed in Twist's early post-IPO SEC filings, and throughout the Relevant Period, that the Company "offer[ed] turnaround times of approximately 11 to 17 business days for clonal genes," and "six to nine business days for non-clonal genes." This was an important metric because it meant Twist could quickly produce and deliver products to customers, which would further increase revenues.

74.     For the same reason, the Individual Defendants repeatedly highlighted Twist's supposed capacity for automated production and scalability. For example, in the Company's Annual Report on SEC Form 10-K for 2019 (the "2019 Form 10-K"), filed on December 12, 2019 and signed by, among others, defendants Leproust, Thorburn, Banyai, Chan, Chess, Crandell, Johannessen, and Ragusa, the Individual Defendants told stockholders that "[f]or synthetic genes, we have built a highly scalable gene production process with what we believe is industry-leading capacity of approximately 45,000 genes per month to address the growing demand of scalable, high-quality, affordable synthetic genes." The Individual Defendants claimed the same for the Company's other products: "The manufacturing process for our NGS tools is highly flexible and

scalable and requires minimal fixed costs and direct labor given the efficiency of our production capability."

75.     These initiatives and their ability to grow Twist's gross margins were also important to stockholders. As analysts at William Blair noted on August 8, 2022, "we see the potential for gross margins between 55% and 60% long term and view the significant gross margin beat in the quarter as evidence of how dramatically Twist will be able to benefit from scale over time."

> **B.      The IPO and Five Secondary Offerings Collectively Raise Over $1 Billion in Proceeds**

76.     Notwithstanding Twist's labor-intensive production process, poor product quality, high error rates and turnaround times, and customer dissatisfaction, as described below, the Individual Defendants caused the Company to initiate numerous public offerings to raise funds. All told, over $1 billion was raised through these public offerings.

### 1.      The October 31, 2018 IPO

77.     Under the Individual Defendants' direction, Twist's IPO was completed on November 2, 2018. In the IPO, 5.75 million shares of Twist common stock were offered (including 750,000 shares sold pursuant to the exercise in full by the underwriters of their option to purchase additional shares), priced at $14 per share. The IPO raised $80.5 million (before deducting underwriting discounts and commissions and offering expenses).

78.     Twist's Registration Statement was declared effective by the SEC and the Company's common stock began trading on NASDAQ on October 31, 2018. In the first day of trading, the share price increased to $14.25 per share.

### 2.      January 27, 2020 Offering

79.     Pursuant to the 2019 Registration Statement, the Individual Defendants caused

Twist to complete an offering on January 27, 2020 (the "January 2020 Offering"). In the January 2020 Offering, 2.24 million shares of Twist common stock were offered, priced at $22.32 per share. The January 2020 Offering raised $49.98 million in gross proceeds.

### 3. February 19, 2020 Offering

80.     Pursuant to the 2019 Registration Statement, the Individual Defendants caused Twist to complete an offering on February 19, 2020 in which 5,339,295 shares of Twist common stock were offered (including 696,428 shares sold pursuant to the exercise in full by the underwriters of their option to purchase additional shares) at $28 per share (the "February 2020 Offering"). The February 2020 offering raised nearly $150 million (before deducting underwriting discounts and commissions and offering expenses).

### 4. June 3, 2020 Offering

81.     Pursuant to the 2020 Registration Statement, the Individual Defendants caused Twist to complete an offering on June 3, 2020, in which 3,484,848 shares of Twist common stock were offered (including 454,545 shares sold pursuant to the exercise in full by the underwriters of their option to purchase additional shares) at $33 per share (the "June 2020 Offering"). The June 2020 Offering raised nearly $115 million (before deducting underwriting discounts and commissions and offering expenses).

### 5. December 2, 2020 Offering

82.     Pursuant to the 2020 Registration Statement, the Individual Defendants caused Twist to complete the December 2020 Offering on December 2, 2020, in which 3,136,362 shares of Twist common stock were offered (including 409,090 shares sold pursuant to the exercise in full by the underwriters of their option to purchase additional shares) at $110 per share. The December 2020 offering raised nearly $350 million (before deducting underwriting discounts and commissions and offering expenses).

6. **February 10, 2022 Offering**

83.     Pursuant to the 2020 Registration Statement, the Individual Defendants caused Twist to complete the February 2020 Offering on February 10, 2022, in which 5,227,272 shares of Twist common stock were offered (including 681,818 shares sold pursuant to the exercise in full by the underwriters of their option to purchase additional shares) at $55 per share. The February 2020 offering raised nearly $287.5 million (before deducting underwriting discounts and commissions and offering expenses).

84.     The following table summarizes the funds raised in the IPO and Twist's other public stock offerings during the Relevant Period:

| Offering | Shares | Offering Price | Approx. Funds Raised |
|---|---|---|---|
| 2018 IPO | 5,750,000 | $14.00 | $80.5 million |
| January 2020 | 2,240,000 | $22.32 | $50 million |
| February 2020 | 5,339,295 | $28.00 | $150 million |
| June 2020 | 3,484,848 | $33.00 | $115 million |
| December 2020 | 3,136,362 | $110.00 | $345 million |
| February 2022 | 5,227,272 | $55.00 | $287.5 million |
| Totals | 25,177,777 | | $1.028 billion |

C.     **Relevant Accounting Principles**

85.     As discussed below, during the Relevant Period, under the Individual Defendants' direction and on their watch, Twist's publicly-reported cost of revenues, R&D expenses, and gross margins were false. The following is a description of the relevant accounting principles that govern cost of revenues, R&D expenses, and gross margins.

86. GAAP compliance is required under the U.S. securities laws to ensure that public companies like Twist issue reliable, accurate financial statements as well as public disclosures that stockholders can rely on and trust. Indeed, federal law requires Twist's CEO and CFO to personally certify the accuracy of the Company's financial statements every quarter. Without GAAP compliance, stockholders are exposed to the risk of material misstatements that exaggerate and distort a company's true financial performance and business, as was the case with Twist.

87. Authoritative GAAP is promulgated by the Financial Accounting Standards Board ("FASB") and contained within the FASB's Accounting Standards Codification ("ASC"). GAAP requires Twist to account for the manufacturing costs incurred to produce the Company's products as a component of cost of revenue, not as R&D expense. ASC Topic 330, *Inventory* ("ASC 330") and ASC Topic 730, *Research and Development* ("ASC 730") contain the relevant GAAP pertaining to the proper classification of manufacturing costs and R&D expenses.

88. Gross Margin, an important profitability ratio evaluated by stockholders, is the amount of revenue after subtracting the cost of revenues. While manufacturing and production costs, as well as any other costs directly or indirectly related to making the products that generate revenue, must be included in cost of revenues, R&D expenses are not. Accordingly, assuming all else being equal, increased manufacturing costs would lead to a lower gross margin, whereas increased R&D expenses would not impact Gross Margin. Therefore, improperly classifying manufacturing costs as R&D expenses necessarily inflates a company's gross margins.

89. ASC 330 states that a major objective of accounting for inventories is the proper determination of income through the process of matching appropriate costs against revenues. Cost includes both direct and indirect production costs that are incurred to bring the inventory to its present condition and location. For goods manufactured, assembled, processed, or otherwise

changed in form, content, or utility, wages of employees directly engaged in the production process and an allocation of indirect production expenses (overhead) should be included in inventory costs.

90. Cost of revenues consist of the costs that are directly or indirectly incurred to make the products that a reporting entity sells or incurred in the process of rendering services that generate revenue. When properly accounting for cost of revenues, a litmus test frequently employed to determine if an expense should be included is whether the expense would exist but for the manufacturing of a current product or service.

91. As defined by the Individual Defendants in Twist's Annual Report on Form 10-K for 2022, filed with the SEC on November 28, 2022 (the "2022 Form 10-K") and signed by, among others, defendants Leproust, Thorburn, Banyai, Chan, Chess, Crandell, Johannessen, Ragusa, and Starovasnik, the Company's cost of revenues "reflects the aggregate cost incurred in the ***production and delivery of our products*** and consists of production materials, personnel costs, cost of expensed equipment and consumables, laboratory supplies, consulting costs, depreciation, production overhead costs, information technology ('IT'), and maintenance and facility costs. Personnel costs consist of salaries, employee benefit costs, bonuses, and stock-based compensation expenses."

92. The Individual Defendants included similar definitions of cost of revenues in all the Company's Annual Reports on SEC Form 10-K filed during the Relevant Period:

> • <u>2021 Form 10-K</u>, filed on November 23, 2021 and signed by defendants Leproust, Thorburn, Banyai, Chan, Chess, Crandell, Johannessen, Ragusa, and Starovasnik: "Cost of revenues reflect the aggregate cost incurred in the production of and delivery of our products and consists of production materials, personnel costs, cost of expensed equipment and consumables, laboratory supplies, depreciation of capitalized equipment, production overhead costs and allocations of information technology ('IT') and facility costs. Personnel costs consist of salaries, employee benefit costs, bonuses, and stock-based compensation expenses."

- **2020 Form 10-K**, filed on November 27, 2020 and signed by defendants Leproust, Thorburn, Banyai, Chan, Chess, Crandell, Johannessen, and Ragusa: "Cost of revenues reflect the aggregate cost incurred in the production and delivery of our products and consists of production materials, personnel costs, cost of expensed equipment and consumables, laboratory supplies, depreciation of capitalized equipment, production overhead costs and allocations of IT and facility costs. Personnel costs consist of salaries, employee benefit costs, bonuses, and stock-based compensation expenses. We expect that our cost of revenues will vary with changes in our revenues and our revenue mix."

- **2019 Form 10-K**, filed on December 13, 2019 and signed by defendants Leproust, Thorburn, Banyai, Chan, Chess, Crandell, Johannessen, and Ragusa: "Cost of revenues reflect the aggregate cost incurred in the production and delivery of our products and consists of production materials, personnel costs (salaries, benefits, bonuses and stock-based compensation), cost of expensed equipment and consumables, laboratory supplies, depreciation of capitalized equipment, production overhead costs and allocations of IT and facility costs. We expect that our cost of revenues will increase as we increase our revenues with new product developments."

- **2018 Form 10-K**, filed on December 20, 2018 and signed by defendants Leproust, Thorburn, Banyai, Chess, Crandell, Johannessen, and Ragusa: "Cost of revenues reflect the aggregate cost incurred in the production and delivery of our products and consists of: production materials, personnel costs (salaries, benefits, bonuses and stock-based compensation), cost of expensed equipment and consumables, laboratory supplies, depreciation of capitalized equipment, production overhead costs and allocations of IT and facility costs. We expect that our cost of revenues will increase as we increase our revenues with new product developments."

93.     The Individual Defendants' definition of "cost of revenues" also aligns with the definition of "costs of goods sold" as used by Twist's outside auditor, Ernst and Young ("EY"): "Cost of goods sold (COGS) are those costs that undoubtedly need to be made in order for a company to deliver a service or produce a good. Without these costs, the product or service would simply not exist." It also aligns with the definition of "cost of sales" as used by Twist's former outside auditor, PricewaterhouseCoopers ("PwC"): "Cost of sales are costs that are directly related to creating the product that a reporting entity sells. Costs may include direct costs, such as labor and raw materials, or indirect costs, such as machinery depreciation, warehouse utilities, stock-

based compensation, and amortization of intellectual property intangible assets." Accordingly, the terms cost of revenue, COGS, and cost of sales are often used interchangeably.

94. Gross Margins are calculated by deducting cost of revenue from total revenue. Gross margin can be presented either as a dollar figure (*i.e.*, revenue – cost of revenue), or as a percentage of total revenue (*i.e.*, (revenue – cost of revenue)/revenue).

95. As noted previously, FASB's ASC 730 is the relevant GAAP pertaining to R&D. FASB defines research as a "planned search or critical investigation aimed at discovery of new knowledge with the hope that such knowledge will be useful in developing a new product or service (referred to as product) or a new process or technique (referred to as process) or in bringing about a significant improvement to an existing product or process" and development as the "translation of research findings or other knowledge into a plan or design for a new product or process or for a significant improvement to an existing product or process whether intended for sale or use."

96. Twist's accounting of R&D was purportedly consistent with FASB's definition of R&D. As defined by the Individual Defendants in the Company's 2022 Form 10-K, signed by defendants Leproust, Thorburn, Banyai, Chan, Chess, Crandell, Johannessen, Ragusa, and Starovasnik, Twist's R&D expenses "consist primarily of costs incurred for the development of our products, which include personnel costs, laboratory equipment and supplies, consulting costs, depreciation, rent, IT, and maintenance and facility costs. Personnel costs consist of salaries, employee benefit costs, bonuses, and stock-based compensation expenses. We expense our research and development expenses in the period in which they are incurred. We expect to increase our research and development expenses as we continue to invest in new product development."

97.     The Individual Defendants included similar definitions of cost of revenues in all the Company's Annual Reports on SEC Form 10-K filed during the Relevant Period:

•       <u>2021 Form 10-K</u>, filed on November 23, 2021 and signed by defendants Leproust, Thorburn, Banyai, Chan, Chess, Crandell, Johannessen, Ragusa, and Starovasnik: "Research and development expenses consist primarily of costs incurred for the development of our products, which include personnel costs, laboratory supplies, consulting costs and allocated overhead, including IT and facility costs. We expense our research and development expenses in the period in which they are incurred. We expect to increase our research and development expenses as we continue to invest in new product development."

•       <u>2020 Form 10-K</u>, filed on November 27, 2020 and signed by defendants Leproust, Thorburn, Banyai, Chan, Chess, Crandell, Johannessen, and Ragusa: "Research and development expenses consist primarily of costs incurred for the development of our products, which include personnel costs, laboratory supplies, consulting costs and allocated overhead, including IT and facility costs. We expense our research and development expenses in the period in which they are incurred. We expect to increase our research and development expenses as we continue to invest in new product development."

•       <u>2019 Form 10-K</u>, filed on December 13, 2019 and signed by defendants Leproust, Thorburn, Banyai, Chan, Chess, Crandell, Johannessen, and Ragusa: "Research and development expenses consist primarily of costs incurred for the development of our products, which include personnel costs, laboratory supplies, consulting costs and allocated overhead, including IT and facility costs. We expense our research and development expenses in the period in which they are incurred. We expect to increase our research and development expenses as we continue to invest in new product development."

•       <u>2018 Form 10-K</u>, filed on December 20, 2018 and signed by defendants Leproust, Thorburn, Banyai, Chess, Crandell, Johannessen, and Ragusa: "Research and development expenses consist primarily of costs incurred for the development of our products, which include personnel costs, laboratory supplies, consulting costs and allocated overhead, including IT and facility costs. We expense our research and development expenses in the period in which they are incurred. We expect to increase our research and development expenses as we continue to develop new products."

98.     ASC 730 states that R&D "does not include routine or periodic alterations to existing products, production lines, manufacturing processes, and other ongoing operations, and it

does not include market research or market-testing activities." Further, ASC 730 states that the following activities are not considered to be within the scope of R&D:

> (a) Engineering follow-through in an early phase of commercial production; (b) Quality control during commercial production including routine testing of products; (c) Trouble-shooting in connection with break-downs during commercial production; (d) Routine, ongoing efforts to refine, enrich, or otherwise improve upon the qualities of an existing product (e) Adaptation of an existing capability to a particular requirement or customer's need as part of a continuing commercial activity; [and] (f) Seasonal or other periodic design changes to existing products.

99.     Consistent with ASC 330 and ASC 730, Twist's current and past outside auditors have confirmed that labor expenses incurred when manufacturing products should be included as cost of revenues rather than R&D. Twist's current auditor, EY, leaves no room for interpretation on this point. EY states that compensation expenses for "[p]ersonnel involved in delivering services or producing goods ends up in cost of goods sold." Twist's former auditor, PwC, has similarly written that "labor . . . related to production should be included in inventory costs for both financial reporting and tax purposes."

### D.     The Extensive Confidential FE Accounts in the Securities Complaint

100.     As alleged herein, the Securities Complaint, which was recently sustained in substantial part by Judge Lee, contains detailed confidential witness accounts provided by six FEs of Twist. Notably, Judge Lee determined that as to defendant Leproust, there was "***a strong inference of scienter***" based on certain of those FE accounts in the Securities Complaint, which appear below.

### 1.     FE-1's Account

101.     According to the Securities Complaint, the FE referred to therein as "FE-1" worked at Twist from July 2019 through April 2022, serving as Senior Bioinformatics Engineer from July 2019 through December 2020, before being promoted and then serving as Bioinformatics Engineering Manager from December 2020 through April 2022. FE-1 is alleged to have worked

in both labs in Twist's South San Francisco, California facility—one lab which manufactured genes and the second which manufactured NGS tools. FE-1 was responsible for QC of Twist's products in both labs. In this role, FE-1 was tasked with knowing and understanding each of the QC processes, as well as executing and managing them. FE-1 also led the team responsible for building the pipelines for production of Twist's products and handled software engineering, including the codes that supported data processing in manufacturing. FE-1 allegedly reported to several top Company executives during this time, including Twist's then-Director of NGS Applications, Esteban Toro ("Mr. Toro"), and Twist's Senior Vice President of Business Technologies, Martin Kunz ("Mr. Kunz").

102. <u>Artificial Inflation of Gross Margins</u>: According to the account of FE-1 in the Securities Complaint, Twist's Gross Margins were inflated by improperly categorizing costs incurred to produce and sell its existing commercial products as R&D rather than cost of revenue. Internally at Twist, when the Company incurred costs or an employee submitted a purchase order for approval, personnel had to select to which department to bill that cost. Twist had a standing policy to expense production costs to R&D: if a cost or expense could be used for R&D or was a shared resource that could at least, in part, be used by R&D personnel, then the entire amount was to be billed to R&D. FE-1 emphasized that this was a "known, understood policy" in place during the COO tenures of Twist's co-founder, defendant Banyai, and then defendant Weiss. Indeed, defendant Weiss is alleged to have instructed employees to expense costs to R&D "as much as possible." In addition, per FE-1's account, if a cost was "common infrastructure" or the cost could be used by R&D in any way, the cost was "not counted as production." Instead, "[i]t would all go to R&D" and the Company recorded the cost as R&D. In adhering to this policy, Twist billed many direct product costs, as well as those incurred in connection with the production process, to R&D.

Per the Securities Complaint, FE-1 provided additional details about several types of expenses that Twist improperly recorded as R&D under Twist's standing policy on production costs, when they should have been included in the cost of revenue:

a. <u>Computation Costs Related to Production</u>: Per FE-1's account, Twist allegedly incurred computation costs to run its production pipeline. These costs were necessary to analyze samples in production, perform QC and apply Twist's pass/fail process, complete the NGS verification, and determine which samples to ship to customers. Twist incurred these computation costs for every product that it produced. Although these costs were related to production, pursuant to Twist's standing policy on production costs, FE-1 and other Twist employees improperly billed these costs to R&D.

   i. The computation costs were essential to production. For example, for production of genes, Twist collected DNA fragments and performed cloning into a bacterial cell or a vector to generate clones. These computation costs were needed to sequence all clones of the genes, to perform the QC process, and to determine which of those clones "passed" QC and met the specifications the customer ordered.

   ii. In addition, Twist's pipeline ran different third-party platforms that formed the basis of the computation resources. These included Amazon Web Services ("AWS"), Illumina BaseSpace ("BaseSpace"), and Seven Bridges Genomics. Each of these contracts alone allegedly cost Twist "six figures or more" at a minimum per year, and the cost Twist owed under these contracts scaled with production, so that Twist had to pay more under each

of these contracts as it produced more products. FE-1's account confirmed that when these contracts were entered into the expense and purchase order approval system, the contracts were "recorded under the R&D side of it."

iii. The Securities Complaint alleges that when FE-1 had to approve the annual AWS services needed to perform QC for Twist's production pipeline, FE-1 asked defendant Weiss where to bill the cost of the contract. Defendant Weiss allegedly told FE-1: "Bill it to R&D. If it is a shared resource that R&D could use in addition to production then bill it to R&D." FE-1 knew that the cost was billed to R&D, as defendant Weiss directed, because FE-1 designated the R&D department as the appropriate department to bill the cost to in Twist's system that tracked such information.

iv. Similarly, with respect to the BaseSpace contract, FE-1 allegedly shared the details of the contract with defendant Weiss and Mr. Kunz, including Twist's estimated usage for production. Defendant Weiss and Mr. Kunz are alleged to have then said to FE-1: "Put it through the expense system and tag it as R&D expense," and FE-1 saw that the contract was then processed in the manner instructed.

b. <u>Production Software</u>: Per FE-1's account, Twist also treated the expense of the software needed to complete orders of its products as R&D rather than cost of revenue. All the software engineering work FE-1 did at Twist was billed to R&D, pursuant to Twist's standing policy on production costs. In addition, the processing and intake of customer orders—which required significant resources and were part

of commercial production and fulfilment of customer orders for Twist's existing products—were not being billed into cost of revenue, but instead into R&D.

c. <u>QC Costs Were Improperly Billed to R&D Rather Than Cost of Revenue</u>: The Securities Complaint alleges based on FE-1's account that every Twist product had multiple levels of QC and Twist's production tools and processes required QC as well. For each product Twist sold to customers, Twist used R&D personnel for troubleshooting and re-making or re-running products on the production line that did not pass QC. Rather than allocate these costs to cost of revenue, they were recorded as R&D. In that regard, FE-1 noted that "none of the salaried employees in R&D were asked to track how much they were working on production." The same was true of FE-1 and FE-1's team.

d. <u>Contamination Remediation Costs Were Improperly Recorded as R&D</u>: The Securities Complaint alleges that during FE-1's tenure at Twist there were contamination problems that periodically shut down production at Twist's South San Francisco facility. These were "Company-wide events" and defendants Leproust and Thorburn were allegedly "aware" and personally involved when contamination events occurred. Each time, Twist had to devote substantial resources to clean up the contamination and get production running again. R&D personnel were pulled into these scenarios to troubleshoot the contamination events related to existing products. FE-1 confirmed that the costs associated with R&D personnel's work in this regard were billed to R&D.

e. <u>Production Costs of Orders From "Important" Customers Were Improperly Recorded as R&D</u>: Per FE-1's account, when an "important" Twist customer, like

Pfizer or AstraZeneca, placed an order—for example, for "10,000 non-standard clonal genes"—Twist would have the R&D staff produce and facilitate delivery of the order.

103.    <u>Misrepresentation of Twist's Production Processes as Automated</u>:  According to FE-1's account, the Company rushed to introduce new products without building the necessary automation around them or knowing how to make them in regular commercial production.

a.    FE-1 stated that Twist represented its production to be automatic, precise, and mechanized when it was not. There were many human touchpoints in the production processes, which resulted in errors, delayed turnaround times, and other production problems, such as contaminations that periodically shut down Twist production labs.

b.    In Monthly Performance Meetings (discussed further below), defendant Leproust advanced a business strategy to try to sell "V1" or "beta" products to quickly generate revenue without having to invest the time and resources in developing an automated process that could produce quality products profitably. Internally, defendant Leproust allegedly advised Twist staff that her strategy was to get a "V1 out"—a first delivery of a commercialized product—to "make sure there is enough interest and then do work to automate it and get more software support for it." Per FE-1's account, defendant Leproust also said in Monthly Performance Meetings that she did not want to invest in the software development needed for automated production, until "we know it is going to sell." For example, with respect to NGS products, the goal was to "get [the product] out, even if it was just one time revenue, it was still revenue."

104.    <u>Defendant Leproust's Business Strategy Contributed to Ballooning Costs and Poor</u>
<u>Product Quality</u>: Per FE-1's account in the Securities Complaint, by the time Twist was able to
ensure there was enough interest in a newly released product to create automation around it, one
or two years had typically lapsed. Throughout this period, Twist was "just throwing more bodies
at the problem," and making products utilizing expensive manual labor rather "than doing the
automation work." FE-1 emphasized that Twist could not "hit the cost" it wanted to achieve
because it was "remaking the product over and over." Due to serious complaints about quality,
Twist had to re-make products for customers multiple times because of the errors. This
reproduction affected all Twist products. If the product does not work, Twist had to "go back and
resynthesize—that is extra cost." Twist based its stated cost figures on "one time through"
production, but in reality had to make products multiple times. Because of this, the Company could
not meet its desired costs.

a.    For example, FE-1 noted that Twist made custom panels, which the Company had
to "print right, QC right, and ship correctly to the customer." Because it lacked the
automation and quality processes necessary to produce the custom panels to
specification on the first try, Twist faced delays in turnaround times and increased
costs when the panels had to be remade.

b.    In addition, Twist made "off the shelf, catalogue products." The Company
produced these catalogue products in lots—large quantities to be stored and
delivered upon order. FE-1 explained that "even lot to lot, the variability was high,"
meaning that Twist could not ensure the same specifications for a particular
product. This generated customer complaints and Twist having to "remake large
batches of things" as a result of the variability. This was specifically an issue with

Twist's exome product. FE-1 confirmed that it was expensive to remake the large lots of exomes, with the entire cost absorbed by Twist. As with so many other aspects of the production process for existing products, R&D staff were involved "to figure out why there was variability from lot to lot."

105. <u>Public Misrepresentations of Twist's Error Rates and Turnaround Times</u>: As alleged in the Securities Complaint, FE-1 knew what the true turnaround times and error rates were because FE-1 was responsible for QC and "saw the raw numbers." FE-1 and FE-1's team wrote the software by which Twist derived error rates and determined how Twist classified product as pass or fail from the sequencing data. Twist's turnaround times and error rates were "definitely underreported." Twist accomplished this by reporting numbers that were "very cherry-picked" to misrepresent the true error rates and turnaround times.

    a. For instance, Twist only counted certain types of errors as counting towards its "error rate," while excluding other errors detected in the QC process overseen by FE-1. So when Twist told the public that, for example, its genes had an "error rate of 1:3000 base pairs," (meaning 1 error in 3,000 base pairs) it concealed that the other 2,999 included base pairs that also had errors but were not reported because they did not fit Twist's narrow definition of errors. FE-1 made clear that additional errors were omitted from the publicly disclosed "error rates" that required reproduction. In reality, according to FE-1's account, Twist's error rate was about 1 in 10 base pairs, or 1 in 10 nucleotides for oligo pools, and certainly never better than 1 in 100.

b.     Additionally, artificial error rates and turnaround times were presented to the public by filtering the data to exclude batches or types of products from the calculation that Twist knew suffered higher error rates or slower turnaround times.

c.     The reported figures that were cherry-picked from manipulated and artificial parameters did not match the actual error rates and turnaround times. For example, Twist batched larger orders, and reported the turnaround time on the first batch as the delivery time for the whole order. This reporting concealed that these orders were still incomplete, and it took Twist much longer to complete production and shipment of the full customer orders.

d.     Per FE-1's account, this manipulation of Twist's data was "easy to do" by playing with data and joining tables. One simply had to "start selecting IDs that fall into a general bucket." Twist's data science and software, coupled with the fact that "every piece of data was in a table in a database," allowed Twist to simply write the appropriate "joins and queries" to "show the data how [the Company] want[ed] it." This manipulation was done by Twist's data science and business intelligence personnel, and the instructions to do so "came from the top."

106.    <u>Executive Meetings</u>: As a senior engineer and manager responsible for overseeing the QC of Twist's products, FE-1 is alleged to have participated in meetings with Twist's C-Suite and VP-level executives, including defendants Leproust, Thorburn, and Weiss, and Mr. Kunz. These meetings included the Monthly Performance Meetings led by defendant Leproust from the South San Francisco facility that were simultaneously broadcast by Zoom. During these meetings, defendant Leproust is alleged to have frequently excused Twist's improper or objectionable behavior as "the cost of doing business." For example, defendant Leproust reportedly admitted

that she "took all the ideas" that her prior company, Agilent, had been working on for years, and took Chief Technology Officer ("CTO") Siyaun Chen ("Mr. Chen") with her from Agilent to found Twist. Per FE-1's account, defendant Leproust frequently described Agilent's lawsuit against her for this, and the settlement paid to resolve it, as simply "the cost of doing business."

    a.      In these meetings, defendant Leproust allegedly reported information that had been conveyed to stockholders and other outside stakeholders, and then presented a separate, "internal only set of slides" with information about technology or production problems or "other types of breakdowns." These internal slides allegedly contradicted the information Twist was publicly conveying.

    b.      In addition, per FE-1's account, defendant Leproust often used the phrase "good enough is good enough" to encourage Twist personnel to prioritize short term sales over product quality and Company reputation. For example, if customers were purchasing a product, then it was not worth spending resources on quality because "good enough is good enough." Defendant Leproust also used her tag line to distinguish "good enough to ship versus actual quality," encouraging employees to make product merely "good enough to ship," which did not represent actual quality. As such, defendant Leproust allegedly urged FE-1 and other personnel working on quality control to sacrifice quality and instead focus on shipping more product, even if it did not meet the high-quality standards Twist represented to the public.

    c.      Defendant Leproust allegedly stated to FE-1 and other Twist personnel in Monthly Performance Meetings that Twist's goal was "getting more revenue and growth," even if Twist sold products that were not profitable. She made these statements in response to questions posed by staff during the meetings about "profit versus

growth." FE-1 specifically recalled that about a year before FE-1 departed Twist, defendant Leproust responded to a question in an all-hands meeting, in which she "very specifically said" that Twist was "targeting growth rather than bottom line profitability."

d.      During meetings, the Company's then-CFO, defendant Thorburn, would show charts demonstrating that Twist was not profitable and identifying under what conditions the Company could potentially be profitable in the future. Throughout FE-1's tenure, senior management pushed out the date Twist could potentially be profitable further out into the future. A lot of people internally at Twist felt that the Company would never be profitable. During the meetings, defendant Thorburn excused this by saying that "investors seem to like what we're doing so we're going to keep doing it."

107.    <u>FE-1's Efforts to Raise Concerns at These Meetings Were Shut Down by Defendant Leproust and Other Senior Executives</u>: Per the Securities Complaint, the two biggest concerns FE-1 had about Twist were "profitability and quality." Twist was skimping on quality, and had "a lot of manual processes, throwing people with Excel to do the tracking, rather than building software to do the tracking," and "recording things in analysis" to make it appear that quality was better than it actually was.

108.    FE-1 allegedly raised concerns directly to defendant Leproust in the Monthly Performance Meetings and to Messrs. Toro and Chen. But Twist's senior executives rejected FE-1's objections. Defendant Leproust's response was: "Good enough is good enough. If a customer thinks it is good enough, we do not have to be holier-than-thou." FE-1 allegedly posed such questions to defendant Leproust "more than two or three times," including after being promoted

to manager. FE-1 recalled that defendant Leproust was called out in front of the whole Company with questions like these in Monthly Performance Meetings. On behalf of colleagues and FE-1's team, FE-1 expressed concerns about decisions that jeopardized the quality of Twist's products and urged Twist to improve its manufacturing quality, but was "shut down."

### 2. FE-2's Account

109. The Securities Complaint alleges that the FE referred to therein as "FE-2" was employed by Twist from August 2017 through June 2023. During this time, FE-2 held the roles of Manufacturing Associate from August 2017 to March 2019, Manufacturing Supervisor from March 2019 to March 2021, and Product Line Specialist from March 2021 to June 2023. FE-2's job responsibilities included managing Twist's manufacturing process, monitoring production metrics, training manufacturing staff, maintaining detailed record keeping and documentation of manufacturing processes, and investigating failures in production and quality control issues.

110. <u>Twist's MES Database Automatically Tracked Error Rates, Turnaround Times, and Other Production Data</u>: According to FE-2's account, Twist tracked its production data using an "Electronic Batch Record System," which employees commonly called "MES"—an acronym for "manufacturing execution system." The system worked as follows: at the start of the manufacturing process, Twist employees scanned barcodes for containers and lot numbers into the MES. Twist's software then automatically generated real-time production data from each stage of the production process, through production completion and shipment to the customer. MES "kept track" of each product "going through the process," and gave Twist visibility into which orders were in the production process, and how long they had been there. The information generated and captured in the MES system included metrics on all aspects of Twist's products. The system produced metrics like turnaround time, the stage in the production process at which a particular

product was located, error rates, and other QC-related information. Most everyone at Twist could access the MES, which provided a general and detailed view of Twist's manufacturing process.

111.    <u>Defendant Leproust and Other Executives Accessed and Used the Twist Production Data</u>: Data from the MES were "linked to a SQL database" that was used for reporting purposes. Twist executives used its SQL (Structured Query Language) tool to generate reports and query specific types of information from the MES. FE-2, FE-2's supervisors, and senior management also had access to the SQL tool, which was sometimes called the SQL database. The SQL tool was used to generate reports and query specific types of information from the MES, such as details about how long production was taking and other metrics regarding the production processes. The data from the SQL database were used to create and inform presentations that senior executives delivered to staff in meetings at the South San Francisco facility. FE-2 attended Monthly Performance Meetings, led by defendant Leproust, where defendant Leproust presented production data from the SQL and MES databases.

112.    <u>Defendant Leproust Led Monthly Performance Meetings</u>: Per FE-2's account, Twist executives held biweekly Performance Meetings in the large breakroom area of the Company's South San Francisco facility. In addition to the in-person attendees, some employees joined by Zoom. On a monthly basis—*i.e.*, at every other biweekly meeting—defendant Leproust led the Twist Performance Meeting. At each of her Monthly Performance Meetings, defendant Leproust allegedly delivered a PowerPoint presentation on how Twist was performing in relation to her corporate goals for that month. Defendant Leproust also presented details on the Company's quarterly performance as compared to her quarterly goals.

113.    During each Monthly Performance Meeting, defendant Leproust utilized PowerPoint to present Twist executives and employees with a detailed analysis of the Company's

metrics for the month or the quarter. Her presentations used data from the SQL database. Defendant Leproust specifically covered production data and production metrics, including the first task yield and error rate, the turnaround time, the number of genes shipped, and the gross margins for Twist products. At the meetings, defendant Leproust discussed and compared Twist's monthly and quarterly results to her goals. Defendant Thorburn was at the monthly meetings as well and discussed the Company's revenues. This internal information contradicted the Individual Defendants' public statements.

114.   At these meetings, defendant Leproust also provided updates about the Company and various topics. In addition, Twist vice presidents presented large scale Company updates. At times, department vice presidents and directors provided updates about activity in their respective parts of the business. There was also a portion of the meetings dedicated to employee questions.

115.   Defendants Leproust and Thorburn Were Personally on Site at the Gene Production Lab: The Securities Complaint alleges that since becoming a specialist in March 2021, FE-2 worked "the 9 to 5" day shift. During this time, FE-2 allegedly observed defendants Leproust and Thorburn each on site visiting the South San Francisco gene production lab where FE-2 worked. Sometimes defendants Leproust or Thorburn would include other senior managers, like Vice President of Manufacturing Jacqueline Fidanza, and stockholders and important customers in these visits. FE-2 is alleged to have personally interacted with defendants Leproust and Thorburn on more than one occasion during their visits to the production lab.

116.   Twist's True Error Rate Was 10%: Per FE-2's account, one metric that defendant Leproust tracked closely and discussed in Monthly Performance Meetings was "first task yield." First task yield represented how often Twist's production was "right the first time," or "how much of the order was correct the first time without anything having to be redone." Twist's internal goal

was to get around 90% first task yield, meaning that 90% of the time, the gene production was done correctly and did not require "anything to be redone." This translated to a 10% error rate, meaning that one in ten of Twist's products failed quality control. Accordingly, 10% of the time manufacturing staff like FE-2 had to send the product back into the production pipeline, or "into the redo process," as FE-2 put it. Detailed metrics regarding Twist's first task yield and error rate were generated "automatically" in the MES database and queued in SQL. Defendant Leproust reported the Company's 10% error rate at Monthly Performance Meetings.

117.     According to FE-2's account, the error rate mattered because more production work was required with respect to the products that failed. FE-2 explained that there were a series of steps that were followed in the 10% of instances where Twist's manufacturing process did not result in an acceptable product. If the production was re-run, and the product failed the quality control check a second time, there was a "manual quality control review conducted," and the product was then "redone again." FE-2 explained that the Company used this manual process because there were a variety of reasons for the errors affecting 10% of the Company's production requiring different efforts to remediate the errors in the QC and re-run process.

118.     <u>Twist's Manufacturing Team Was Forced to Replace Missing, Defective, and Contaminated Products</u>: After manufacturing was complete, employees conducted QC checks and DNA purification before the product was processed in containers and shipped to the customer. Throughout FE-2's time at Twist, production quality and shipments to customers were never "perfect." Customers contacted Twist's customer support team to make complaints about the products they received. There were several different complaints and defects, including Twist shipping: (i) empty "containers that did not have the product," meaning that the product was

entirely missing; (ii) genes where the "DNA was the wrong sequence"; and (iii) products infected with cross-contamination.

119.    When customers raised these complaints to Twist about missing, defective, or contaminated shipments, FE-2 and the manufacturing team made the product again and Twist incurred the cost of doing so without receiving additional payment from the customer.

120.    Twist established a protocol for responding to customers' complaints about missing, defective, or contaminated products. These complaints were investigated, documented, and discussed in department-level meetings. As a product specialist, FE-2 was personally involved in investigating these types of customer complaints. FE-2 worked with quality control personnel as part of these investigations. FE-2 "tracked back" the product through the MES to identify the day the product was shipped, what machines were used in production, and who was working on the product with the goal of identifying where the problem occurred. FE-2 communicated FE-2's findings to the quality control personnel and prepared "incident reports" to memorialize the errors that generated customer complaints. Twist also held department-level meetings involving product specialists, supervisors, and managers, during which customer complaints were discussed. FE-2 recalled that there were, for example, instances in which FE-2's investigation determined that the problems that led to customer complaints occurred in the last process of production, "by the time they were doing the shipping process" and after the product had already been "QC-ed and verified."

121.    FE-2 used two different types of software—called Confluence and Jira—to prepare the "incident reports" on product errors that led to customer complaints. FE-2 explained that this software allowed the report writer to document the issue and to "attach SOPs," or standard operating procedures. Once incident reports were completed, they were discussed in department-

level meetings. The director of manufacturing used the incident reports in presentations to the production team as "teaching moments" and to try "to prevent future errors." Kum Ming Woo ("Mr. Woo") was the director of manufacturing for some time until the spring of 2022, when he was replaced by Brian Scott ("Mr. Scott"). Messrs. Woo and Scott delivered the same presentations regarding the incident reports multiple times to ensure that everyone understood the customer complaint problems at Twist.

122.    <u>Production Lab Contamination in the Spring of 2022</u>: In the spring of 2022, Twist's gene production lab had a major issue in which "a large amount of product was failing QC checks." For a period of weeks, Twist conducted an extensive investigation which caused "significant delays" in the shipment of Twist products and the first task yield was very low. FE-2 reported that "a lot of things went into redo and things were on hold during the investigation."

123.    FE-2's account confirmed that defendant Leproust "definitely knew" of the cross-contamination issue that plagued Twist's gene lab in 2022. FE-2 prepared reports and the manager then met with other managers and multiple directors to discuss FE-2's reports. These meetings were aimed at trying to discover where in the production process the issue was occurring; whether it was "in gene production or before gene production." The managers and directors used the information from FE-2's reports to provide updates to defendant Leproust on the status of the issue.

124.    <u>Twist's Production Was Not Fully Automated</u>: Per FE-2's account, despite efforts to automate the production process, Twist was not able to achieve automation and consequently was forced to rely on various human touchpoints and manual steps to manufacture the Company's products. For example, the production process required that humans prepare the machines for manufacturing, but the machines required that the preparation be done to exact specifications. This

could not always be achieved with human preparation, resulting in production errors. In addition, materials were moved between machines by humans rather than an automated process. FE-2 explained that in the 10% of products that suffered from production errors, the most common root causes were human error or instrument error.

### 3. FE-3's Account

125. According to the Securities Complaint, the FE referred to therein as "FE-3" served as Twist's Director of Bioinformatics and Data Science from August 2020 to August 2022, and was based in the Company's South San Francisco office. In this capacity, FE-3 oversaw three different teams. First, FE-3 oversaw the Data Science team, which had responsibility for QC at Twist's manufacturing lab and worked on the design of Twist's Factory of the Future, among other things. Second, FE-3 oversaw a team responsible for building the pipelines for production, including the codes that supported data processing in manufacturing. Third, FE-3 oversaw a team providing bioinformatics and data science support for early research and "computational research." FE-3 reported to Twist's SVP of Business Technologies, Mr. Kunz who, in turn, reported to defendant Weiss, the COO.

126. <u>Customer Complaints</u>: FE-3 is alleged to have worked on NGS tools and, in particular, on panels sold to customers as a means to detect specific bio markers in research and experiments. There were smaller panels—for instance, for specific types of cancer—and larger panels that detected phenotypes. In this work, FE-3 was advised of customer complaints about these NGS tools through numerous channels, including from: (i) field application scientists; (ii) Twist's sales team; (iii) Twist's customer relationship staff; and (iv) Twist executives directly for particularly serious issues. FE-3 suspected that FE-3 would have heard only a small fraction of customer complaints about Twist's products because FE-3 did not receive any direct customer feedback. The complaints were only routed to FE-3 in instances where the underlying issue was a

pipeline problem that "needed to be fixed," or when "people could not figure out what was happening and" the Company "had to use computational methods to track it down."

127.    Per FE-3's account, examples of production issues that caused complaints about these NGS tools include instances where: (i) customers would re-order the same panel but receive "big differences" in terms of the product that was shipped; (ii) the target effect of the panel failed to meet the appropriate threshold; (iii) materials were not binding correctly; and (iv) there were "sequences that were not supposed to be there," there was an "extra probe," or "something was missing."

128.    To address these customer complaints, VP-level executives discussed the issues with FE-3's team and other teams as well. In the reporting hierarchy, VP-level executives reported directly to C-suite executives, and Directors like FE-3 reported directly to VP-level executives. The customer complaints were "no secret," "everyone knew." VP-level executives were directly involved in troubleshooting to try to resolve the production problems that were causing customer complaints and would regularly check-in with FE-3's team about the status of remediation efforts. Twist's R&D team was "usually" involved in responding to customer complaints and trying to resolve the underlying problems in Twist's production of its products.

129.    Contamination Shutdowns: At least twice during FE-3's two-year tenure at Twist, there was "contamination in the lab" in South San Francisco which held up production for a "few weeks at a time—three or four weeks." One contamination event occurred in the first six months after FE-3 began work in August 2020. Twist had another contamination in the spring of 2022.

130.    Given how Twist's lab was designed and used, even the smallest mistake with the tiniest amount of trace DNA could amplify and cause a major problem, such as contamination issues. In other words, as FE-3 explained, contamination issues were inevitable at Twist's lab

52

because of the design of the lab and the purpose of the production system. For instance, a worker simply putting the wrong plate in the wrong place could result in the system becoming contaminated.

131.     To remediate the contamination issues, Twist had to shut down the whole lab and "really clean the lab." "The whole production had to stop." And the delays impacted "anyone who had an order in the pipeline" at the time of the contamination.

132.     It was "really hard" and time-consuming to identify the source of the contamination and remediate the problem. Twist's production and delivery could not continue until the issue was resolved. That is, "[n]one of the products would pass quality control" unless the contamination issues were resolved.

133.     Per FE-3's account, defendants Leproust and Thorburn were "definitely aware" of the contamination issues. As FE-3 put it, "Oh yes, everyone knew. When we had contamination, it was a big deal and everyone knew." When contamination events occurred, it became "top priority and there was nothing more important because the lab gets shut down."

134.     <u>Monthly Performance Meetings</u>: According to FE-3, defendant Leproust held Monthly Performance Meetings with Twist executives and employees. The meetings were on Wednesdays and lasted one hour. These meetings were hosted via Zoom. And there was a message at the start of each meeting informing participants that the meetings were being recorded. Hundreds of personnel attended these meetings.

135.     At each meeting, defendant Leproust presented PowerPoint slides to the attendees, covering various topics, including general company updates. "Emily did a lot of the talking" during the meetings, according to FE-3. At times, department heads also made presentations at the meetings.

136. FE-3 distinctly recalled defendant Leproust discussing the contamination issues during Company meetings, including the Monthly Performance Meetings and/or separate meetings specifically held to discuss the contamination. At these meetings, defendant Leproust was displeased, and she discussed "lessons learned" on contamination with the attendees and ways to try to stop the contaminations that were shutting down the Company's production.

137. These Monthly Performance Meetings were recorded and available for employees to view on Twist's internal network. On some occasions, FE-3 accessed these recordings and viewed them from the Twist internal network.

138. <u>Monthly Leadership Meetings</u>: Defendant Leproust also led regular meetings each month among Company leadership. Through approximately early 2021, these meetings were attended by C-Suite executives, VP-level leadership, and directors. FE-3 attended as a director. At these meetings, defendant Leproust presented in-depth discussion and analysis about "what was going on" with each of Twist's products, including problems or delays with respect to each one. FE-3 provided an update on FE-3's work at these meetings. In approximately early 2021, however, Twist changed these meetings to restrict them to just C-Suite executives and VP-level leadership, so directors like FE-3 no longer attended.

139. <u>Operations Meetings with Defendant Weiss and Mr. Kunz</u>: FE-3 regularly met with SVP Mr. Kunz, and COO defendant Weiss. During these meetings, Mr. Kunz and defendant Weiss frequently sought information, making comments to the tune of: "Emily wants to know. Emily this or Emily that." The discussions at these regular meetings further indicated to FE-3 that defendant Leproust was deeply involved with all matters at the Company.

140. <u>Defendant Leproust's Business Strategy of "Good Enough is Good Enough" Jeopardized Quality and Undermined Automated Production</u>: When Twist first launched, it

quickly gained market share among producers of DNA. However, as time passed and more competitors entered the market, other companies were able to produce DNA "as well" as Twist. As FE-3 noted, "just selling genes, oligos, plasma, and panels is a saturated market." As a result, Twist "has been struggling to come up with new products to utilize the DNA they print." Throughout FE-3's employment at Twist, until at least approximately early 2022, "everything was about pushing out new products," FE-3 recalled. This drive for new products "jeopardized the quality of everything because the priority was push out more." Further, Leproust told the employees, "If you have to do it manually, it is okay. We just want [the product] out." Defendant Leproust espoused this advice while conveying her signature tag line: "Good enough is good enough." FE-3 said that defendant Leproust said this tag line often in meetings. Defendant Leproust allegedly repeated the tag line so often that some employees made T-shirts that featured the tag line as a "bad joke." The shirts said: "Good enough is good enough."

a.  Quality Deficiencies: In FE-3's role overseeing the Data Science team, FE-3 dealt with QC at Twist's manufacturing lab. Twist's QC team and the senior engineer responsible for QC in production voiced concerns that Twist had jeopardized the quality of its products and urged Twist to improve its manufacturing quality. But these concerns were rejected, FE-3 explained. Twist's senior leadership, including Messrs. Toro and Chen, advised that quality control would be done quickly and imprecisely and that would be good enough. Specifically, Twist could have improved QC by spending more money on early computational detection software that monitored the manufacturing and having more checks in manufacturing. Twist's QC evaluation was "somewhat arbitrary," and QC failures were measured based on a "tolerance to errors—there was no gold standard."

b.  <u>Lack of Automation</u>: Automating Twist's manufacturing process "was not the priority." The priority was "rolling out more product, even if it meant doing things more manually. That was the message all the way from the CEO." Defendant Leproust told the employees, "If you have to do it manually, it is okay. We just want it out." FE-3 explained that there were some steps in production that had to be done manually, outside the scope of the software for such production. FE-3 observed that "things definitely could have been faster if there was more automation." Twist knew which products and steps required manual production tasks because the Company internally accounted for the extra time that was necessary due to lack of automation.

### 4.  FE-4's Account

141.    According to the Securities Complaint, the FE referred to therein as "FE-4" served as Twist's Senior Application Scientist, NGS Bioinformatics from November 2017 to December 2020. FE-4 reported to two different directors who, in turn, reported to Senior Director Patrick Finn. During FE-4's tenure, Twist faced major failures in the NGS products it sold to customers. FE-4 was involved in uncovering why Twist's products were failing, particularly its NGS panels. "More than half" of the thousands of customers to whom Twist sold NGS products complained that Twist's NGS tools did not work. Customers were upset and made complaints that "you sold us something that is not working."

142.    <u>Twist Used Falsified Data to Report False Error Rates</u>: Per FE-4's account, Twist "falsified data and information to project an image that it was the forefront leader" in the market for these DNA products. For example, the error rates Twist reported were not obtained using actual products that it manufactured in its production line for customers. Rather, Twist created "gold data," which were the very best results that Twist had ever achieved in artificial conditions using

different, prototype versions of its products. Twist could not replicate its "gold data" results in actual commercial production, and it never achieved the metrics it presented outside the Company. Nonetheless, Twist would use the "gold data" as a basis for "hammering away" and falsely representing to the public and customers that it had these capabilities. This disconnect between the product capabilities Twist presented and the actual capabilities of its products generated constant customer complaints and frustration.

143. <u>Defendant Leproust and Twist's Leadership Were Fully Aware of Product Problems and Customer Complaints</u>: FE-4 allegedly had "hundreds" of conversations and meetings with defendant Leproust about these product failures, quality control errors, and customer complaints. These included more formal "Development Meetings" with defendant Leproust in the company of other executives. In addition, FE-4 sent emails to defendant Leproust "all along" FE-4's tenure, including in 2018—the year of Twist's IPO—which FE-4 said was a was a messy situation internally for the Company. According to FE-4's account, discovery in the Securities Action will show numerous emails to defendant Leproust as well as calendar notices for meetings with defendant Leproust about these issues that defendant Leproust concealed from the public. At Development Meetings, which included defendants Leproust, Thorburn, and Banyai, as well as Mr. Chen, Senior Director Quality Assurance Kathleen Perry, Co-Founder Bill Peck, and others, defendant Leproust discussed how to "manage" these problems and how to "manage" Twist's customers who were frustrated by the fact that Twist's NGS products did not work. FE-4 was responsible for working directly with Twist customers, creating marketing materials to onboard customers and educate them about Twist products, and traveling around the world to "try to smooth over" customer concerns about faulty products. The instruction handed down by senior management was to never admit when Twist's products failed or did not work. FE-4 was told to

try to convince the customers that the issues they experienced could be attributed to the customers' actions, even when the problem was actually that Twist's product did not work. To pacify customers who had received a failed or defective product, Twist employees were instructed to give "serious discounts" on that product or just "comp" the product or send replacement products to customers for free. In many cases, Twist's replacement products did not work either, so Twist would incur substantial expense to continuously send more than one replacement product to the same customer. FE-4 said, customers "stopped ordering" from Twist "all the time" after experiencing quality issues with NGS panels and kits.

144. <u>Defendant Leproust and Twist Leadership Encouraged Employees to Conceal the Truth About Twist's Failures</u>: Although defendant Leproust was very concerned about the large number of customer complaints, to FE-4's surprise and frustration, defendant Leproust tried to suppress internal discussion about the product failures and production problems. FE-4 was instead told that, as a customer-facing employee, FE-4 should try to convince customers that the customers did something wrong, rather than admit "what Twist did wrong." Defendant Leproust would insist that Twist was "the top dog," "doing great," and employees "shouldn't talk about these problems," which contradicted the image of Twist that defendant Leproust had presented to the public. Even though FE-4 was instructed not to discuss problems that contradicted defendant Leproust's public messaging, FE-4 purposely continued to bring them up and let defendant Leproust know about the production failures and customer dissatisfaction that caused FE-4 to work unusually long hours. Nonetheless, defendant Leproust and Twist's management pressured customer-facing employees to make these kinds of misrepresentations to customers. Even though FE-4 objected that the way Twist treated its customers was "disgusting," FE-4 was told to "just get it done." FE-4 also raised FE-4's concerns with Vice President of Human Resources Paula Green, but nothing changed.

145. <u>Twist Could Not Solve Its Production Problems</u>: FE-4 worked with R&D personnel, including Mr. Chen, the CTO, and the Director of NGS Research, Ramsey Zeitoun, to try to address the QC issues and deal with customer complaints. FE-4 described Twist's R&D department as "chaotic, at best." At the time, Mr. Chen led the R&D function. Chen's "whole MO was it worked once, so it is a product." However, once the products were put into production, there was "no reproducibility," and this was particularly true with the NGS panels Twist sold to customers. FE-4 was dismayed and raised multiple times the lack of reproducibility for Twist's NGS Tools, but Mr. Chen was "honored for pushing products out" in this fashion and, to Twist's senior management like defendant Leproust, Mr. Chen was the "golden child." In the Development Meetings (discussed above), defendant Leproust and Twist's senior leadership "were always in this mode of build the airplane while it is in flight."

146. Twist R&D staff was involved in trying to remediate and handle these issues but they were unable to resolve the failures or fix production problems. These included instances where customers ordered the same panels but received different, incompatible versions, making it difficult for customers to use the products effectively for research.

147. There were also problems with the "wet lab" chemistry for Twist's existing NGS products. "[S]o many customers were annoyed" that "it simply did not work." Twist R&D staff was actively involved in the wet lab and there was a "lot of QC they did not get right; they had to reiterate and replace kits so many, so many times" because "something clearly did not work" in the wet lab portion of production. FE-4 emphasized that "for a long, long time, they just could not get it right and had to reiterate over and over and remake and gave it to customers for free."

148. <u>Leadership Shut Down FE-4</u>: Eventually, FE-4 was "frozen out" of the Development Meetings with defendant Leproust and other executives. FE-4 was specifically asked

"not to attend," because FE-4 was "the one to bring up the problems and no one wanted to hear the problems."

## 5.    FE-5's Account

149.    According to the Securities Complaint, the FE referred to therein as "FE-5" was employed by Twist as an NGS Sales Specialist from March 2021 to November 2021, covering the New England territory. During this time, FE-5 sold Twist's NGS tools to Twist customers.

150.    <u>Turnaround Times</u>: Based on training FE-5 received at Twist, FE-5 told customers that Twist would ship its synthetic probes (an NGS tool) to them in four to six weeks. But FE-5's manager informed the team that instead of a four-to-six-week turnaround time, they should expect delivery to take "10 to 12 weeks." FE-5 emphasized that the turnaround time turned out to be "more like 12 or 16 weeks." This meant that FE-5's customers, like Harvard University, were having to wait "three months" or longer to receive the NGS tools they ordered from Twist.

151.    Per FE-5's account, customers were upset about the delays. FE-5 stated, "My clients were like: 'Whoa! What is going on? I don't want to lay off people from my lab" because Twist cannot deliver the product. FE-5 pointed out that at one point, Harvard had ordered $250,000 in probes from Twist, but the delivery was significantly delayed. Harvard was unhappy because it had to "shut down a lab for four to six weeks" in summer 2021 because it could not get the probes it needed from Twist within the expected turnaround time. FE-5 reported that this illustrated the type of issue that occurred all too often at Twist.

152.    Twist's inability to meet its reported turnaround times was discussed during the weekly Northeast region sales calls that FE-5 attended. FE-5 knew from these calls that the entire Northeast region was experiencing similar issues. FE-5 and the other sales specialists conveyed their concerns about the delays in turnaround times to the region manager during the calls. They pleaded, "You got to get this stuff going and get it out."

153.     But instead of resolving the production problems, the delays at Twist were getting worse. FE-5 noted that the longer FE-5 worked at Twist, the "harder it was for them" to deliver probes. FE-5 learned through discussions with a Twist scientist and FE-5's supervisor that the delays occurred because Twist was "behind on production."

154.     <u>Pricing/Discounts</u>: Twist gave customers "steep" discounts on its products. FE-5 had the authority to give discounts to every customer, and FE-5 did, even for recurring customers. All discounts greater than 10-20% were specifically approved by FE-5's boss. It was not uncommon for FE-5 to give customers a 25% to 50% discount, and in some cases FE-5 was given authority to offer a discount of up to 70%. Critically, there was no "pricing floor" for the Twist sales team. And in contrast to other employers that shared manufacturing costs with the sale teams, Twist withheld this information. At Twist, FE-5 was "always asking" about costs, but never received that information.

### 6.     FE-6's Account

155.     According to the Securities Complaint, the FE referred to therein as "FE-6" worked at Twist from November 2019 through July 2023 and held the positions of Shipping Coordinator & Export Compliance (November 2019 to October 2020), Manufacturing Associate (October 2020 to October 2021), and Team Lead (October 2021 to July 2023). Throughout this time, FE-6 worked on site at Twist's South San Francisco facility. FE-6 reported to a supervisor named Anthony Canoy ("Mr. Canoy"). Mr. Canoy reported to Production Manager Philip Lucero, who reported to Manufacturing Director Mr. Scott.

156.     <u>Contamination</u>: Per FE-6's account, there were at least two instances when the lab was shut down as a result of contamination. The shutdowns "caused delays" in turnaround times because Twist was "not producing anything" for weeks. During such shutdowns, no orders were

shipped, no product went out, there was no progress on orders that were in production, and no production started on new or existing orders.

157.    There was a significant amount of manpower dedicated to trying to discern the source of the contamination. Twist had to test, among other things, "everything from [the Company's] suppliers," product that had already been manufactured, and "all the material that had been touched." Some of the material had to be placed in incubators "for days or weeks" to assess whether it was part of the contamination. FE-6 was involved in cleaning the lab following contamination events and recounted having to "clean the lab upside down, cleaning the nooks and crannies and decontaminating the lab from corner to corner, ceiling to floor." It then took additional time after the shutdown was resolved to get production started again because there was a backlog of customer orders and Twist had to select which customers to prioritize.

158.    "Of course" defendant Leproust knew about the contamination issues, according to FE-6's account. FE-6 noted that "when operations are shut down, all that goes up the ladder really quickly" and large groups of personnel quickly become involved in the effort, which likely would have required executive approval. Defendant Leproust also discussed the contamination issues at meetings. At least once per month, defendant Leproust held a "business meeting" to provide updates to the Company. These meetings were available on Zoom, and attendees posted questions to the "Zoom chat" during the presentations. Defendant Leproust and other executives would respond to the questions during the meeting or provide answers later to employees via the Twist Intranet or at the next meeting.

159.    Customer Complaints: FE-6 became aware of customer complaints due to FE-6's work in manufacturing. For example, Twist faced delays and shipping-related issues for products made for international customers. This would lead to situations like the product sitting for five or

six days where it thawed and then spoiled before the customer even received it. In these instances, Twist would have to either find and send a replacement product if it was in stock or remake the spoiled product if none was in stock.

160.     Skewed Turnaround Times: At Twist, FE-6 observed that the "details of the turnaround times were skewed." For example, FE-6 explained, if a customer ordered 100 products in one order, Twist broke that order up into batches. Twist may have shipped out the first 10 products of the 100-product order in five days and counted the turnaround time for the whole order as five days, even though "the whole order had not been completed."

161.     MES software: Twist used MES software to track production and information about the status of production of customer orders; this information was readily available in the MES system when FE-6 wanted to look it up. From MES, Twist "planners" evaluated customer orders and would "pick and choose, in batches," what should be produced and when.

162.     Production Errors: FE-6 recounted different types of production errors. For example, because of a lack of automation, Twist had operator errors and operator mishandling problems. Twist had to hire and train operators for the production process; these types of errors "came in waves," and newer operators usually made more errors. For instance, the human operators inadvertently "flipped plates" that contained samples onto the table. At times, these plates, which contained as many as "400 samples and three weeks of product," were then lost because of the "flipping." Twist had to make those samples again. Additionally, these operator errors could affect samples not on the plate, causing contamination of additional samples, along with more reproduction.

163.     Other types of production errors included "oversights," as well as ineffective communication between manufacturing personnel. For example, as part of production, Twist

personnel had to incubate certain components for a certain number of hours, *e.g.*, 10 hours. However, there were errors in which the materials were incubated for well over 10 hours, even up to 24 hours.

164. Another production problem was a failure by production staff to report errors due to "not wanting to be at fault." When these mistakes were not caught in QC checks, defective products would be sent to customers. And even when the mistakes were caught in QC checks, weeks' worth of production time was lost because Twist had to reproduce the product.

165. FE-6 emphasized that it was not just the human touchpoints that created errors and contamination in the lab. For example, Twist machines also flipped plates, causing Twist to have to remake products. One of the "main machines," the "Hamilton," was an automatic liquid handler robot that moved liquid from one plate to another plate. The Hamilton robot also lifted the plates. There were issues at the South San Francisco gene lab in which there was adhesive on the plates, resulting in the robot not being able to fully disengage the plates and ultimately flipping them in the lift process as a result.

166. Finally, FE-6 explained that, depending on the product, there was a QC check in Twist's production line. In some cases, products failing QC were sent back into the pipeline "a few steps back." Some Twist products failed the quality check consistently, and in those instances, everything had to be restarted "all the way back to the beginning of the production process."

### E. The 2020 Registration Statement and Related Public Offerings

167. On June 3, 2020, the Individual Defendants caused Twist to file the 2020 Registration Statement. The 2020 Registration Statement specifically incorporated by reference information that it said was "considered to be part of this prospectus." The information incorporated by reference into the 2020 Registration Statement included "any future filings we make with the SEC under Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act on or after the

date of this prospectus (other than, in each case, documents or information deemed to have been furnished and not filed in accordance with SEC rules) until the termination of the registration statement of which this prospectus is a part" and the following specific documents, among others: Form 10-K for the year ended September 30, 2019; Forms 10-Q for the quarters ending December 31, 2019 and March 31, 2020; and the Forms 8-K filed on October 25, 2019, October 29, 2019, December 18, 2019, January 8, 2020, January 13, 2020, January 27, 2020, February 6, 2020, February 7, 2020, and February 20, 2020.

168.   The Individual Defendants caused Twist to complete three public offerings linked to the 2020 Registration Statement, including the December 2020 Offering and the February 2022 Offering.

### 1.   The December 2020 Offering

169.   On December 1 and December 4, 2020, the Individual Defendants caused Twist to file successive prospectus supplements to the 2020 Registration Statement for the sale of approximately $300 million in common stock. The December 1 and 4, 2020 prospectus supplements were specifically made "a part of" the June 3, 2020 Form S-3.

170.   The December 1 and 4, 2020 prospectus supplements incorporated by reference, among other things, Twist's Form 10-K for the year ended September 30, 2020; the information in Part III of Twist's Form 10-K for the year ended September 30, 2019 (other than information furnished rather than filed); and "[a]ll documents filed by Twist Bioscience Corporation under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act, that are filed (excluding, however, information we furnish to the SEC) by us after the date of the prospectus and prior to the termination of this offering."

171.   On December 7, 2020, the Individual Defendants caused Twist to announced the close of the December 2020 Offering, in which 3,136,362 shares of Twist common stock were

sold (including 409,090 shares sold pursuant to the exercise in full by the underwriters of their option to purchase additional shares) at a price of $110 per share, for nearly $350 million in gross proceeds (before deducting underwriting discounts and commission and offering expenses).

## 2. The February 2022 Offering

172.    On February 9 and February 14, 2022, the Individual Defendants caused Twist to file prospectus supplements to the 2020 Registration Statement for the sale of approximately $250 million of common stock. The February 9 and 14, 2022 prospective supplements were specifically made "a part of" the June 3, 2020 Form S-3.

173.    The February 9 and 14, 2022 prospective supplements incorporated by reference the Form 10-K for the year ended September 30, 2021; the Forms 10-Q filed with the SEC for the quarter ending December 31, 2021; the information in Part III of Twist's Form 10-K for the year ended September 30, 2021 (other than information furnished rather than filed), as incorporated by reference to the Proxy Statement, filed with the SEC on January 4, 2022; the Forms 8-K and 8-K/A filed with the SEC on November 22, 2021, November 23, 2021, and December 2, 2021; and "[a]ll documents filed by Twist Bioscience Corporation under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act, that are filed (excluding, however, information we furnish to the SEC) by us after the date of the prospectus and prior to the termination of this offering."

174.    On February 15, 2022, the Individual Defendants caused Twist to announce the close of the February 2022 Offering, in which 5,227,272 shares of Twist common stock were sold (including 681,818 shares sold pursuant to the exercise in full by the underwriters of their option to purchase additional shares) at a price of $55 per share, for received nearly $287.5 million in gross proceeds (before deducting underwriting discounts and commission and offering expenses).

### 3. False and Misleading Statements Regarding Gross Margins and Related Financial Metrics in the 2020 Registration Statement

175. In the 2020 Registration Statement and/or the 2019, 2020, and 2021 Forms 10-K incorporated therein by reference, the Individual Defendants reported Twist's cost of revenues,[32] R&D expenses, and gross margins for the fiscal years 2019, 2020, and 2021. Those annual figures are reproduced in the following table:

| Filing | Cost of Revenue | R&D Expense | Gross Margin |
|---|---|---|---|
| 2019 Form 10-K | $47,426 | $35,683 | 12.8% |
| 2020 Form 10-K | $61,406.00 | $43,006 | 31.8% |
| 2021 Form 10-K | $80,620.00 | $69,072 | 39.1% |

177. The 2020 Registration Statement incorporated by reference the Company's Form 10-Q for each fiscal quarter beginning with the fourth quarter of 2019 and ending with the fourth quarter of 2021. Specifically, the 2020 Registration Statement incorporated by reference "any future filings we make with the SEC under Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act on or after the date of this prospectus (other than, in each case, documents or information deemed to have been furnished and not filed in accordance with SEC rules) until the termination of the registration statement of which this prospectus is a part." In each of these quarterly reports, the Individual Defendants reported Twist's revenues, cost of revenues, and R&D expenses. In the Forms 10-Q for the first quarter of 2021 to the third quarter of 2021, the Individual Defendants caused Twist to report gross margins. Those quarterly figures are reproduced in the following table:

---

[32] All numbers in thousands of USD.

| Filing | Cost of Revenue[33] | R&D Expense | Gross Margin |
|---|---|---|---|
| 4Q 2019 Earnings Press Release Filed on Form 8-K | $12,386 | $10,496 | Not reported in filing |
| 1Q 2020 Form 10-Q | $13,792 | $10,297 | Not reported in filing |
| 2Q 2020 Form 10-Q | $13,564 | $10,629 | Not reported in filing |
| 3Q 2020 Form 10-Q | $16,472 | $10,444 | Not reported in filing |
| 4Q 2020 Earnings Press Release Filed on Form 8-K | $17,578 | $11,636 | Not reported in filing |
| 1Q 2021 Form 10-Q | $18,162 | $14,000 | 35% |
| 2Q 2021 Form 10-Q | $19,028 | $15,791 | 39% |
| 3Q 2021 Form 10-Q | $20,933 | $19,838 | 40% |
| 4Q 2021 Earnings Press Release Filed on Form 8-K | $22,500 | $19,400 | Not reported in filing |

178.    The foregoing statements concerning Twist's cost of revenue, R&D expenses, and gross margins were false and misleading and omitted and concealed the truth that at the time of the statements:

a.    R&D: Under Twist's standing policy on production costs, Twist billed production costs for the Company's existing products as R&D. This included the following costs: (i) computation costs to run Twist's production pipeline, including to analyze samples, perform QC, apply Twist's pass/fail process, complete NGS verification, and determine which samples to ship to customers; (ii) production software needed

---

33    All numbers in thousands of USD.

to complete orders of Twist products; (iii) day to day quality control for existing products; (iv) contamination remediation; and (v) production when the orders for Twist products came from "important" customers. Due to this improper mischaracterization, the R&D numbers that the Individual Defendants reported in Twist's SEC filings were false. Accordingly, the amount the Company actually spent on R&D was materially lower than the Individual Defendants claimed in the Company's SEC filings.

b. <u>Cost of Revenues</u>: By improperly recharacterizing expenses that Twist actually incurred in manufacturing its products as R&D expense, the Company necessarily reported materially understated cost of revenues. U.S. GAAP required Twist to account for these expenses as cost of revenue rather than R&D. Accordingly, the Company's true cost of revenues as stated in each quarterly and annual filing was materially higher than the Individual Defendants stated.

c. <u>Gross Margin</u>: Gross margin percentage is calculated by subtracting cost of revenues from the company's total revenue and dividing by the company's total revenue. Understating the cost of revenue and overstating the R&D expenses necessarily resulted in the Company reporting artificially inflated gross margins. As such, the Company's gross margins were materially overstated in the foregoing statements.

**F.      False and Misleading Statements Regarding Twist's Products in the 2020 Registration Statement**

179.    In Twist's 2019, 2020, and 2021 Forms 10-K, which were each signed by most of the Individual Defendants, including certain Board members, and incorporated by reference into the 2020 Registration Statement, the Individual Defendants stated:

The core of our platform is a proprietary technology that pioneers a new method of manufacturing synthetic DNA by "writing" DNA on a silicon chip. We have combined this technology with proprietary software, scalable commercial infrastructure, and an e-commerce platform to create an integrated technology platform that enables us to achieve high levels of quality, precision, automation, and manufacturing throughput at a significantly lower cost than our competitors.

180.    In Twist's 2019 and 2020 Forms 10-K, incorporated by reference into the 2020

Registration Statement, the Individual Defendants also stated:

We offer turnaround times of approximately 11 to 17 business days for clonal genes.

*** 

We offer turnaround times of six to nine business days for non-clonal genes with what we believe is the lowest industry error rate of 1:3000 base pairs.

*** 

We sell a diverse, customizable set of oligo pools, ranging from a few hundred oligos to over one million and offer oligonucleotides of up to 300 nucleotides in length with an error rate of 1:2000 nucleotides and turnaround times beginning at five days.

181.    In Twist's 2019 and 2020 Forms 10-Ks, incorporated by reference into the 2020

Registration Statement, the Individual Defendants stated that Twist had "automated [its] entire

workflow using proprietary and over-the-counter laboratory equipment."

182.    In Twist's 2019 Form 10-K incorporated by reference into the 2020 Registration

Statement, the Individual Defendants stated:

The ability of the Twist DNA synthesis platform to precisely manufacture target enrichment probes at large scale has dramatically increased the types of projects that can now be addressed using NGS technologies. Our platform has unlocked new applications, improved data quality, and dramatically expanded the types of scientific questions that can be answered using NGS. In addition, the speed of our DNA synthesis platform enables customers to quickly deploy NGS technologies to applications where the time to answer is critical.

183.    In Twist's 2019 Form 10-K incorporated by reference into the 2020 Registration

Statement, the Individual Defendants stated:

For synthetic genes, we have built a highly scalable gene production process with what we believe is industry-leading capacity of approximately 45,000 genes per month to address the growing demand of scalable, high-quality, affordable synthetic genes.

\*\*\*

The manufacturing process for our NGS tools is highly flexible and scalable and requires minimal fixed costs and direct labor given the efficiency of our production capability. We have automated the entire workflow using proprietary and over-the-counter laboratory equipment. We have built dedicated production capabilities for our NGS products.

184. In Twist's 2019 Form 10-K incorporated by reference into the 2020 Registration

Statement, the Individual Defendants stated:

For all of our contracts to date, the customer orders a specified quantity of a synthetic DNA sequence; therefore, the delivery of the ordered quantity per the purchase order is accounted for as one performance obligation. Some contracts may contain prospective discounts when certain order quantities are exceeded; however, these future discounts are either not significant, not deemed to be incremental to the pricing offered to other customers, or not enforceable options to acquire additional goods. As a result, these discounts do not constitute a material right and do not meet the definition of a separate performance obligation. We do not offer retrospective discounts or rebates.

\*\*\*

Our customer contracts generally include a standard assurance warranty to guarantee that our products comply with agreed specifications. We reduce revenue by the amount of expected returns which have been insignificant.

185. The foregoing statements by the Individual Defendants were false and misleading

and omitted and concealed the truth that at the time the statements were made:

Lack of Automation: Twist's production process was not automated, precise, highly accurate, reproducible, or integrated; it did not operate at a large scale, nor was it scalable. Twist was not able to achieve automation and consequently was forced to rely on human touchpoints and manual steps to make Twist products.

Product Quality and Error Rate: Twist's synthetic DNA and NGS products were produced with a high error rate, poor quality, and with variation or incompatibility that made them unfit for Twist customers. Twist shipped incomplete, defective, or contaminated products to customers, causing significant customer complaints. Twist utilized "cherry-picked" numbers to underreport the true error rates of its

products, which was actually 1:10 (10%), not 1:3000 to 1:7500 (0.033-0.013%) as the Individual Defendants stated.

Slow and Unpredictable Turnaround Times: The Individual Defendants misrepresented Twist's turnaround times and omitted that the Company consistently failed to meet turnaround times to customers. The Individual Defendants' statements concealed that Twist's shutdowns and production problems exacerbated its slow and unpredictable turnaround times. The Individual Defendants utilized "cherry-picked" numbers to underreport Twist's true turnaround times. Twist's publicly disclosed turnaround times excluded batches or types of products from the calculation that suffered slower turnaround times.

Contamination Events: The Company's production labs suffered periodic contamination events, a consequence of the lack of automation, which also exacerbated poor turnaround times. These contamination events required Twist to shut down its manufacturing operations, causing delays in turnaround times because production was halted for weeks. During such shutdowns, no orders were shipped, there was no progress on orders that were in production, and no new production was able to start on new or existing orders.

Customer Dissatisfaction: Twist received significant customer complaints. These complaints included customers receiving: (i) empty "containers that did not have the product," meaning that the product was entirely missing; (ii) genes where the "DNA was the wrong sequence"; (iii) products infected with cross-contamination; (iv) spoiled products; (v) non-functioning products; and (vi) products that did not match the specifications to the previous versions of the same products.

Retrospective Refunds, Discounts, and Rebates: When problems occurred in Twist's NGS product line, which happened with approximately 50% of orders, the Company offered retrospective discounts and refunds. Further, these products were often returned, resulting in significant costs to the Company.

186.    Other False and Misleading Statements Regarding Gross Margins and Related Financial Metrics During the Relevant PeriodIn Twist's 2018, 2019, 2020, and 2021 Forms 10-Ks, each of which was signed by most of the Individual Defendants, including certain current Board members, the Individual Defendants reported Twist's cost of revenues, gross margins, research and development expenses, or some combination of all three metrics. Those annual figures are reproduced in the following table (all numbers in thousands of USD):

| Filing | Cost of Revenue | R&D Expense | Gross Margin |
|---|---|---|---|
| 2018 Form 10-K | $32,189 | $20,347 | Not Reported in Filing |
| 2019 Form 10-K | $47,426 | $35,683 | 12.8% |
| 2020 Form 10-K | $61,406 | $43,006 | 31.8% |

187.     In Twist's Quarterly Reports on SEC Form 10-Q for each fiscal quarter beginning with the fourth quarter of 2018 and ending with the third quarter of 2022, the Individual Defendants reported Twist's cost of revenues, gross margins, and R&D expenses. Those quarterly figures are reproduced in the following table (all numbers in thousands of USD):

| Filing | Cost of Revenue | R&D Expense | Gross Margin |
|---|---|---|---|
| 4Q 2018 Earnings Press Release Filed on Form 8-K | $9,093 | $6,065 | Not Reported in Filing |
| 1Q 2019 Form 10-Q | $11,857 | $7,273 | Not Reported in Filing |
| 2Q 2019 Form 10-Q | $11,789 | $8,907 | Not Reported in Filing |
| 3Q 2019 Form 10-Q | $11,394 | $9,007 | Not Reported in Filing |
| 4Q 2019 Earnings Press Release Filed on Form 8-K | $12,386 | $10,496 | Not Reported in Filing |
| 1Q 2020 Form 10-Q | $13,792 | $10,297 | Not Reported in Filing |
| 2Q 2020 Form 10-Q | $13,564 | $10,629 | Not Reported in Filing |
| 3Q 2020 Form 10-Q | $16,472 | $10,444 | Not Reported in Filing |
| 4Q 2020 Earnings Press Release Filed on Form 8-K | $17,578 | $11,636 | Not Reported in Filing |
| 1Q 2021 Form 10-Q | $18,162 | $14,000 | 35.00% |

| | | | |
|---|---|---|---|
| 2Q 2021 Form 10-Q | $19,028 | $15,791 | 39.00% |
| 3Q 2021 Form 10-Q | $20,933 | $19,838 | 40.00% |
| 4Q 2021 Earnings Press Release Filed on Form 8-K | $22,500 | $19,400 | Not Reported in Filing |
| 1Q 2022 Form 10-Q | $27,056 | $22,630 | 35% |
| 2Q 2022 Form 10-Q | $29,714 | $31,231 | 38% |
| 3Q 2022 Form 10-Q | $30,974 | $36,840 | 45% |

188. During Twist's quarterly and year-end earnings conference calls with stockholders and analysts, defendant Thorburn reported Twist's gross margin.

189. During Twist's earnings call for the second quarter of 2019, defendant Thorburn stated: "Our gross margin was 13% positive for the quarter, and we're now positive gross margin year-to-date."

190. During Twist's earnings call for the third quarter of 2019 on August 1, 2019, defendant Thorburn stated: "Our gross margin for the third quarter is positive 16%."

191. During Twist's earnings call for the 2019 fourth quarter and fiscal year on December 11, 2019, defendant Thorburn stated:

> As Emily noted, the fourth quarter was another very strong quarter for us in terms of revenue growth and increased gross margins. Our annual revenue for 2019 was $54.4 million, which exceeded our revised upward guidance of $52 million to $53 million. This represents another year of triple-digit growth for Twist. As we continue to grow our revenue and leverage our fixed costs, our gross margins improved, and the margin for the year was $7 million positive compared to a negative gross margin of $6.8 million in the previous fiscal year 2018.

192. During Twist's earnings call for the first quarter of 2020 on February 6, 2020, defendant Thorburn stated: "Our gross margin was positive $3.4 million at 20%, essentially flat sequentially."

193.    During Twist's earnings call for the second quarter of 2020 on May 7, 2020, defendant Thorburn stated: "Our gross margin for the quarter was 29.7% as compared to approximately 13% in the same quarter last year, and up from 20% in quarter 1."

194.    During Twist's Earnings Call for the third quarter of 2020 on August 6, 2020, defendant Thorburn stated: "Our gross margin for the third quarter was 22%, which is impacted by our scale-up of our DNA preps for clonal genes."

195.    During Twist's earnings call for the 2020 fourth quarter and fiscal year on November 23, 2020, defendant Thorburn stated: "Our orders for the fiscal year achieved a record $116.7 million, and revenue was $90.1 million, and our gross margin scaled to 31.8% for the year . . . . Our gross margin is notable in the fourth quarter with positive 46%."

196.    During Twist's earnings call for the fourth quarter and fiscal year 2021 on November 22, 2021, defendant Thorburn stated: "Gross margin for the fourth quarter was 40.7%, and our total year gross margin was 39% as compared to 32% in FY '20."

197.    In Twist's earnings call for the second quarter of 2019 on April 30, 2019, the first question was asked by a JP Morgan analyst concerning gross margins: "Maybe I'll start with the gross margins. Nice improvement there. Can you maybe just touch on how much of this was just volume leverage versus maybe some manufacturing efficiencies?" Defendant Thorburn responded: "A lot of it [*i.e.*, Twist's reported high Gross Margins] is a combination of volume and manufacturing efficiencies. As we've scaled our NGS, we've seen our NGS costs come down, which is driving manufacturing efficiencies."

198.    In Twist's earnings call for the fourth quarter of 2020 on November 23, 2020, defendant Thorburn touted the Company's gross margins in his prepared remarks at the outset of the earnings call, stating: "As we've noted before, the increase in our margin reflects the impact

of scaling our revenues, leveraging our fixed costs and the benefits of a higher mix of NGS products and terrific execution by our organization."

199.    In Twist's earnings call for the first quarter of 2021 on February 4, 2021, an analyst from JPMorgan questioned why the Individual Defendants did not project further increases in Twist's gross margins, asking, "You've left top line guidance unchanged despite the beat this quarter. But you increased the gross margin guide just to account for the higher-margin in the quarter, so essentially leaving the rest of the year the same. Is this just typical conservatism? Or is there something else to call out here?" Defendant Thorburn answered by reassuring the analyst three times that the Individual Defendants had been "conservative" with Twist's gross margins and the Company was "on track" to achieve "55% to 60" gross margins, stating:

> It's conservative. We are in [the] middle of a pandemic. We're off to a really strong start, and we see good strong synbio business. We're seeing -- experiencing good business in Europe. In the U.S., we had a $4.5 million shipment on liquid biopsy. So our NGS business is going strong. Synbio business is going strong. Regionally, we're doing well. And at the same time, we're being conservative.
>
> We saw our gross margins increase to 36%. And we feel good about improving our gross margins as we increase our revenue, our longer- term gross margin targets 55% to 60%, and we're on track for that. But just to summarize, we are being conservative and prudent in the middle of the pandemic.

200.    During that same February 4, 2021 earnings call, defendant Thorburn also stated:

> Our gross margin for the quarter was $10 million or 35.5% of revenue as compared to 20% in quarter 1 of '20. This increase in margin reflects the impact of scaling our revenue, leveraging our fixed costs and the benefit of higher mix of NGS products earlier in the year than anticipated and also reflects great execution by our organization.

201.    Discussing the Company's gross margins at JP Morgan's 2021 Healthcare Conference on January 11, 2021, defendant Leproust stated:

> [O]ur business model is such that we do have high fixed costs, but we have low variable costs, which means that once we [have absorbed] the fixed cost, any dollar above that, big portion of that drops to gross margin. And so that's why as our revenue ramps, we'll be able to show that our gross margin ramps as well.

202. The Individual Defendants' foregoing statements about Twist's cost of revenue, gross margins, and R&D expenses were false and misleading and omitted and concealed the truth that before and during the Relevant Period:

Research and Development: Under Twist's standing policy on production costs, Twist routinely billed production costs for Twist's existing products as R&D. This included the following costs: (i) computation costs to run Twist's production pipeline, including to analyze samples, perform QC, apply Twist's pass/fail process, complete NGS verification, and determine which samples to ship to customers; (ii) day to day quality control for existing products, (iii) contamination remediation, and (iv) production when the orders for Twist products came from "important" customers. Due to this improper mischaracterization, the R&D numbers that the Individual Defendants reported in Twist's SEC filings were false. Accordingly, the amount the Company actually spent on R&D was materially lower than the Individual Defendants claimed in SEC filings.

Cost of Revenues: By improperly recharacterizing expenses that Twist actually incurred in manufacturing its products as R&D expense, the Individual Defendants necessarily caused Twist to report materially understated cost of revenues. U.S. GAAP required Twist to account for these expenses as cost of revenue rather than R&D. Accordingly, the Company's true cost of revenues as stated in each quarterly and annual filing was materially higher than the Individual Defendants stated.

Gross Margin: Gross margin percentage is calculated by subtracting cost of revenues from the company's total revenue and dividing by the company's total revenue. Understating the cost of revenue and overstating the R&D expenses necessarily resulted in the Company reporting artificially inflated gross margins. As such, the Company's gross margins were materially overstated in the foregoing statements.

### G. Other False and Misleading Statements Regarding Twist's Products During the Relevant Period

203. In Twist's 2018, 2019, 2020, and 2021 Forms 10-K, which were signed by most of the Individual Defendants, including certain current Board members, the Individual Defendants stated:

The core of our platform is a proprietary technology that pioneers a new method of manufacturing synthetic DNA by "writing" DNA on a silicon chip. We have combined this technology with proprietary software, scalable commercial infrastructure, and an e-commerce platform to create an integrated technology platform that enables us to achieve high levels of quality, precision, automation, and manufacturing throughput at a significantly lower cost than our competitors.

204.    In Twist's 2019 and 2020 Forms 10-K, the Individual Defendants stated:

We offer turnaround times of approximately 11 to 17 business days for clonal genes.

*** 

We offer turnaround times of six to nine business days for non-clonal genes with what we believe is the lowest industry error rate of 1:3000 base pairs.

*** 

We sell a diverse, customizable set of oligo pools, ranging from a few hundred oligos to over one million and offer oligonucleotides of up to 300 nucleotides in length with an error rate of 1:2000 nucleotides and turnaround times beginning at five days.

205.    In Twist's 2018, 2019, 2020, and 2021 Forms 10-K, the Individual Defendants

stated that Twist had "automated [its] entire workflow using proprietary and over-the-counter

labatory equipment."

206.    In Twist's 2019 Form 10-K, the Individual Defendants stated:

The ability of the Twist DNA synthesis platform to precisely manufacture target enrichment probes at large scale has dramatically increased the types of projects that can now be addressed using NGS technologies. Our platform has unlocked new applications, improved data quality, and dramatically expanded the types of scientific questions that can be answered using NGS. In addition, the speed of our DNA synthesis platform enables customers to quickly deploy NGS technologies to applications where the time to answer is critical.

207.    In Twist's 2019 Form 10-K, the Individual Defendants also stated:

For synthetic genes, we have built a highly scalable gene production process with what we believe is industry-leading capacity of approximately 45,000 genes per month to address the growing demand of scalable, high-quality, affordable synthetic genes.

*** 

The manufacturing process for our NGS tools is highly flexible and scalable and requires minimal fixed costs and direct labor given the efficiency of our production capability. We have automated the entire workflow using proprietary and over-the-

counter laboratory equipment. We have built dedicated production capabilities for our NGS products.

208.    Speaking at the JP Morgan Healthcare Conference on January 15, 2020, defendant Leproust stated: "Because we can print any DNA we want, we have accumulated the human repertoire, all the sequences from antibodies that have been sequenced, we know what those are, and we can introduce that genetic content into libraries. On top of it, we have automated everything."

209.    Speaking at the Cowen Healthcare Conference on March 7, 2022, defendant Leproust stated: "But again because we have built a great engine internally that leverages the whole [next-gen innovate] from Twist; leveraged the explicit synthesis that makes sure that all our mutants are fully human- derived, so high-quality mutant; and then miniaturized and automated . . . [w]e were able to overall have more productivity than anybody else. So that means that we could do things that others could not. We literally take more shots on goals than everyone else. So 100% of time it works."

210.    In Twist's 2019 and 2020 Forms 10-K, filed with the SEC on December 12, 2019 and November 25, 2020, respectively, the Individual Defendants claimed that the Company produced synthetic DNA "with what [Twist] believe[s] is the lowest industry error rate of 1:3000 base pairs . . . and customizable set of oligo pools . . . with an error rate of 1:2000 nucleotides."

211.    In Twist's 2021 Form 10-K, filed with the SEC on November 22, 2021, the Individual Defendants claimed that the Company produced: "[N]on-clonal genes with an error rate of 1:7500 base pairs."

212.    Discussing Twist's synthetic DNA products at the 2019 Cowen Health Care Conference on March 12, 2019, defendant Leproust stated: "We have actually perfect quality, we ship perfect DNA. The customer experience is excellent."

213.    Later during that same conference, defendant Leproust touted the customer satisfaction with Twist's products: "So those were our product launches which is -- were very well received. In addition, we had four customer presentations to highlight the performance of our product. In the past it used to be me or people from Twist saying we are great and we'll lower your sequencing costs. And now we don't have to do that because the Broad Institute and other customers are saying it for us."

214.    At the JPM Healthcare Conference on January 11, 2021, defendant Leproust claimed: "In NGS, why we win is because of our quality. On the left, because we are higher uniform -- we have higher uniformity of oligo synthesis. And we can reduce the [noise] of sequencing and our customers report that they need to sequence half as much with Twist as with the competition to get the same answer. And so we win there."

215.    Discussing the Company's NGS product line during Twist's earnings call for the fourth quarter of 2019 on December 11, 2019, defendant Leproust stated: "[O]ur view so far is that we still have the fastest turnaround time and the best price for custom panel." Discussing Twist's NGS product line at JPMorgan's 2020 Healthcare Conference, defendant Leproust stated: "If you want a new panel, it takes 6 to 8 weeks with the competition to get it, and then you have to test it. With Twist, it's 2 to 3 weeks. So if you have to do 2, 3 rounds of optimization to get your assay developed, you can do your R&D twice as fast with Twist." Two years later at SVB Leerink's 2022 Healthcare Conference on February 17, 2022, defendant Leproust stated in regard to NGS product turnaround time that: "We swiftly [ph] combined a million probe panels for just 100 samples, probably for $20,000 and you get it in two weeks."

216.    During Twist's earnings call for the second quarter of 2022 on May 5, 2022, an analyst asked about Twist's flexibility on price. Defendant Leproust responded: "So we're

definitely not subsidizing anybody else's drug discovery . . . . In terms of our ability or our willingness to be flexible on economic terms, we are very flexible. But there's definitely a red line where any deal has to pay for our cost, right? So the bare minimum. We're not going to do a deal that's not a gross margin positive. We're not in the business of subsidizing our customers' research."

217. The foregoing statements by the Individual Defendants were false and misleading and omitted and concealed the truth that before and during the Relevant Period:

Lack of Automation: Twist's production process was not automated, precise, highly accurate, reproducible, or integrated; it did not operate at a large scale, nor was it scalable. The Individual Defendants' business strategy, which they concealed from stockholders, was to try to sell early version products (internally called "V1" or "beta") to quickly generate revenue, without an automated production process to produce a product until "we know it is going to sell." Internally, defendant Leproust advised her staff that the goal was to "get [the product] out, even if it was just one time revenue, it was still revenue" and that, "[i]f you have to do it manually, it is okay. We just want [the product] out." Twist was not able to achieve automation and consequently was forced to rely on human touchpoints and manual steps in order to produce Twist products.

Product Quality and Error Rate: Twist's synthetic DNA and NGS products were produced with a high error rate, poor quality, and variation or incompatibility that made them unfit for use in research or experimentation by Twist customers. Twist shipped incomplete, defective, or contaminated products to customers, causing significant customer complaints. The Individual Defendants utilized "cherry-picked" numbers to underreport the Company's true error rates in producing its products, which was actually 10%, not 1:3000 to 1:7500 (0.033- 0.013%) as the Individual Defendants stated. The Individual Defendants created the error rates they caused Twist to present to stockholders by artificially filtering its data to only include prototype versions that were not actually made in the production line used for customers, and excluding batches or types of products from the calculation that were known internally to have suffered higher error rates.

Slow and Unpredictable Turnaround Times: Under the Individual Defendants' direction and on their watch, the Company misrepresented and failed to meet turnaround times to customers. The Individual Defendants' statements concealed that Twist's shutdowns and production problems exacerbated its slow and unpredictable turnaround times. The Individual Defendants utilized "cherry-picked" numbers to underreport Twist's true turnaround times. Twist's publicly

disclosed turnaround times excluded batches or types of products from the calculation that suffered slower turnaround times.

<u>Contamination Events</u>: The Company's production labs suffered periodic contamination events, a consequence of lack of automation, which also exacerbated poor turnaround times. These contamination events required Twist to shut down its manufacturing operations, causing delays in turnaround times because production halted for weeks. During such shutdowns, no orders were shipped, there was no progress on orders that were in production, and no new production started on new or existing orders.

<u>Customer Dissatisfaction</u>: Twist received significant customer complaints. These complaints included customers receiving: (i) empty "containers that did not have the product," meaning that the product was entirely missing; (ii) genes where the "DNA was the wrong sequence"; (iii) products infected with cross-contamination; (iv) spoiled products; (v) non-functioning products; and (vi) products that did not match the specifications of previous versions of the same products. These problems were rampant. For example, "[m]ore than half" of the thousands of customers to whom Twist sold NGS products complained that Twist's NGS tools did not work. Following instructions from senior management, when products failed, Twist employees denied the failure and instead tried to convince customers that it was the customer's fault. Twist employees gave "serious discounts" or sent replacement products to customers for free. In many cases, Twist's replacement products did not work either, so Twist re-made and re-shipped replacement products multiple times to the same customer. Customers "stopped ordering" from Twist "all the time" after experiencing quality issues with NGS panels and kits.

### H. The Truth Emerges

218. The Individual Defendants' public statements during the Relevant Period were revealed to be false when the Scorpion Report was published on November 15, 2022. The Scorpion Report was the result of 20 research interviews conducted by Scorpion, including those with ex-executives and manufacturing employees of Twist, customers, competitors, and industry experts.

219. The Scorpion Report directly highlighted the Individual Defendants' false and misleading statements to stockholders. By referencing earnings calls, conference call transcripts, and SEC filings, the Scorpion Report contrasted the Individual Defendants' public statements with reports from Twist's former employees, customers, and industry experts indicating the Individual Defendants had made materially false and misleading statements throughout the Relevant Period.

220.     Specifically, the Scorpion Report revealed, among other things, that: (a) Twist's gross margins were inflated as a result of improperly expensing direct manufacturing costs like labor as research and development and capital expenditures; (b) Twist was covering up a manual, labor intensive, and fatally flawed manufacturing process that was crippled by errors, bottlenecks, and poor yields; (c) Twist's DNA and NGS tool products suffered QC problems, had high error rates, and deficient or incomplete genes were often shipped to customers; (d) Twist suffered poor turnaround times that exceeded promised delivery times and were worse than industry standards; and (e) Twist suffered significant customer complaints.

221.     Despite the Individual Defendants' public claims that the Scorpion Report was "highly misleading, with many distortions and inaccuracies," they failed to address any of the specific allegations in the Scorpion Report. The Individual Defendants' public statements, which amounted to a blanket denial with no specificity regarding which allegations were untrue, did not instill confidence, as reflected in analyst reports following the Scorpion Report.

222.     An analyst report from Evercore ISI published on November 18, 2022, noted that the Scorpion Report negatively impacted Twist's stock price—specifically the accounting allegations. The Evercore analyst report stated: "[T]he recent short report noted that TWST dismissed PWC as its auditor and had hired E&Y (Co noted it was a competitive process and E&Y had a local audit team). The general investor feedback has been that accounting firm change is not a good sign." Similarly, J.P. Morgan noted on the same day that, "[Twist's] management had limited commentary regarding the [Scorpion] report" and that "the [Scorpion] report will continue to be an overhang on the story and investor sentiment for a number of quarters."

223.     Also on November 18, 2022, SVB Securities noted that "[t]he stock reaction . . . suggests that there is significant doubt on whether TWST can deliver on its now higher FY24

guide and steep gross margin improvements." Further, SVB noted that the fiscal year 2024 guidance for Twist provided by the Individual Defendants following the publication of the Scorpion Report "is likely to be perceived as aggressive and reactionary to the [Scorpion] report given an uncertain macro backdrop next year."

224. The effect of the Scorpion Report's revelations on Twist's stock price was also noted in a December 7, 2022 analyst report published by CrispIdea Equity Research, which stated: "The company has been alleged to have high cash burning ratio. It is experiencing cash burn issues despite a strong balance sheet. Recently, it has also been labelled as 'cash burning inferno' by a short selling company Scorpion Capital. *The stock of the company reacted soon to this news and it tumbled*."

225. As a result of the Individual Defendants' Relevant Period misstatements exposed in the Scorpion Report, as well as their limited response in disputing the Scorpion Report's allegations, Twist's share price declined catastrophically. Despite closing at $38 per share the day prior to the release of the Scorpion Report, the Company's stock lost *over 20% of its value in a single day* on November 15, 2022. Over the next three days, Twist's stock continued to plummet, closing at *a two-year low* of $24.81 per share. This three-day decline represented a loss in value of *almost 35%* following the publishing of the Scorpion Report.

## I.     The Sustained Securities Action

226. The Securities Action was filed against Twist in the Northern District of California in December 2022. The operative Securities Complaint, based in part on six confidential FE accounts, was subsequently filed on October 11, 2023 against Twist and defendants Leproust and Thorburn. The Securities Complaint asserted fraud-based claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of investors who purchased or acquired Twist shares during the "Class Period" of December 20, 2018 through November 15, 2022, as well as strict liability and

negligence claims under Sections 11 and 15 of the Securities Act on behalf of purchasers in certain of Twist's public offerings.

227.     The defendants to the Securities Action moved for dismissal following the filing of the Securities Complaint. On September 3, 2025, however, Judge Lee sustained the Securities Complaint in material part. Specifically, Judge Lee: (a) sustained claims under Section 10(b) of the Exchange Act against Twist and defendant Leproust; (b) partially sustained claims under Section 20(a) of the Exchange Act against defendants Leproust and Thorburn; (c) partially sustained claims under Section 11 of the Securities Act against Twist and defendants Leproust and Thorburn; and (d) partially sustained claims under Section 15 of the Securities Act against defendants Leproust and Thorburn.

228.     Among other things, in sustaining the Securities Action in significant part, Judge Lee concluded that the Securities Complaint adequately alleged that investors were misled based on certain Product Statements (statements regarding Twist's production, manufacturing, and product capabilities) during the Class Period, as well as Financial Metrics Statements (statements about Twist's financial metrics and results). With respect to certain of the Product Statements that Judge Lee concluded were sufficiently alleged to have been false and misleading, Judge Lee further determined that as to defendant Leproust, there was "***a strong inference of scienter***" based on the accounts of FE-1, FE-2, FE-3, and FE-4 in the Securities Complaint. In light of those detailed confidential witness accounts, Judge Lee held there was "***a strong inference that Leproust was at least reckless as to the allegedly false Product Statements***."

229.     Following Judge Lee's September 3, 2025 Order sustaining the Securities Action (in substantial part), the defendants filed an answer to the Securities Complaint on October 21, 2025, and the case is currently proceeding towards trial.

## J. Internal, Board-Level Documents Confirm the Individual Defendants' Knowledge of the Misconduct Described Herein

230. Via his pre-suit inspection demand issued pursuant to §220, Plaintiff has obtained Board-level, non-public Company documents which are highly relevant to the factual allegations and claims asserted against the Individual Defendants herein. The Board-level, non-public evidence which Plaintiff has obtained from the Company supports Plaintiff's allegations, among other things, of knowing misconduct by a majority of the current members of the Board.

231. For example, the Individual Defendants continually received updates regarding ████████████████████████ at Board meetings during the Relevant Period.[34] One of these updates was even delivered by defendant ███████████████████████████████ ████ allegations regarding inflated gross margin in the Securities Complaint, as he allegedly directed Twist employees to tag costs as R&D instead of cost of revenue. Additionally, some of these updates also included ████████████████████████████████

232. Additionally, after the Board received an update regarding ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

233. Moreover, some of the minutes of meetings of the Board during the Relevant Period even directly referenced ████████████████████████████ For example,

---

[34] ███████████████ ████████████ ██████████████ █████████████ ████████████████████████████████████████████████████ ████

[35] ███████████████ ████████████ ██████████████ █████████████ ██████████████████████

[36] ███████████████████████

██████████████████████ meeting of the Board, ████████████████████████████████████

██████████████████████████████████ the Board received an update ██ ████████

██████████████████████████████████████████████████████████████████████████████

██████████████████

234.    Subsequently, at the ████████████ meeting of the Board, ██████████████████████

████████████████████████████████████████████████████████ the Board was

updated ████ ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

Additionally, at this Board meeting, the Board members also were informed ████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████

235.    Then, at the ██████████████ meeting of the Board, ████████████████████████

██████████████████████████████████████████████████████████████████ the

Board received a report ████████████████████████████████████████████

236.    Additionally, the Audit Committee continually received updates regarding the

Company's quarterly and annual financial performance which, among other things, included a

review of ████████████████████████████████ ██████████████████████████ Audit

_____

37 ██████████████████████████████

38 ██████████████████████████████

39 ██████████████████████████████

40 ██████████████████████████████

41 ██████████████████████████████████████████████████████
██████████████████████████████████████████████████

Committee meeting minutes reflect that ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████ █

237.    As such, during the Relevant Period, the Board consistently reviewed ███

████████████████████████████████████████████████████████████████████████████

█ Thus, the Individual Defendants were continually apprised on ███████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

238.    The only references in the Production to actions by the Board████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████ Yet, nothing in the Production ██████████████████

███████████████████████████████████████ In fact, there is nothing in the Production

████████████████████████████████████████████████████████

239.    The Board only leaped into action after the Scorpion Report was published. And,

when it did, ███████████████████████████████████████████████████████████████

████████████████████████████

240.    Specifically, the Board formed ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████ █

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

---

42    ██████████████████████

43    ████████████████████████████████████

44    ████████████████████████████████████

███████████████████████████████████████████ ████████████████████

██████████████████████████████████████████ Additionally, the Audit

Committee ████████████████████████████████ ██ ████████████████

████████████████████████ █

241.   ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████ █

242.   ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████ █ At this meeting, ████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████ █ ████████████████████████████

██████████████████████ █

243.   This is curious as ███████████████████████████████████

██████████████████████████████ This sort of conflict raises doubt, at minimum,

---

45   ██████████████████████████

46   ████████████████████████████████████████████████████
     ████████████████████████████████████████████████████
     ████████████████

47   ██████████████████████████

48   ██████████████████████████

49   ██████████████████████████

50   ██████████████████████████

51   ████████████████████████████████

█████████████████████████████████████████████████████████████

especially when Orrick was and is responsible for defending the Company and defendants Leproust and Thorburn in the Securities Action. Illustratively, the law firm Seyfarth published a post in 2017 titled, "Internal Investigations Special Committees Resource" which advised that counsel to a special committee conducting an internal investigation "represent **only the committee and not the company or the full board of directors**."[52] Seyfarth additionally stated that counsel retained by a special committee "should not be the company's regular outside counsel."[53]

244.    In fact, this engagement of Orrick as defense counsel in the Securities Action, while

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████ defending the Company and those individuals who are named defendants in the Securities Action, such as defendant Leproust, as to whom Judge Lee has found "**a strong inference of scienter**". This tension not only renders ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

245.    Later at the ███████████████████████████████ the members were provided with ███████████████████████████████████████

---

[52]       https://corpgov.law.harvard.edu/2017/07/06/internal-investigations-special-committees-resource/#:~:text=Legal%20Counsel,-The%20committee%20should&text=Committee%20counsel%20should%20represent%20only,potential%20target%20of%20the%20investigation. (emphasis added).

[53]       *Id*.



246.

247. Subsequently, ████████████████████████████ The minutes reflect that ███████████████████████████ In the span of ████████████████████████

248. ████████████████████████████ Indeed, ██████ ████████████████████████████████

249. Moreover, as has been alleged in the Securities Action, the Individual Defendants

---

have never refuted the allegations in the Scorpion Report in detail. All that was ever offered as a repudiation was a simple Company press release which stated that the Scorpion Report "is highly misleading, with many distortions and inaccuracies" and that "[u]nlike the author of the short-seller report, Twist is a public company, and is committed to communicating truthfully, creating value for all shareholders, and being good stewards of capital."[59] This is despite the █████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

250.   ████████████████████████ (1) the Individual Defendants, including Board members, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (2) the Board ███ ████████████████████████████████████████████████████████████ (3) the Company's outside counsel ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ (5) the Production ████████████████████████████████████████████████████████ ████████████████

[59]    https://investors.twistbioscience.com/news-releases/news-release-details/twist-bioscience-addresses-misleading-short-seller-report.

[60]    ████████████████████

## VI. DAMAGES TO TWIST

251. Twist has been, and will continue to be, severely damaged and injured by the Individual Defendants' breaches of fiduciary duty and other misconduct.

252. As a direct and proximate result of the Individual Defendants' misconduct, Twist has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

      a.      legal fees associated with lawsuits filed against Twist and its officers and directors for violations of the federal securities laws, including the partially-sustained Securities Action;

      b.      loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

      c.      amounts paid to outside lawyers, accountants, and investigators in connection with any investigations; and

      d.      loss of revenues and profits.

## VII. DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

253. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

254. Plaintiff is a current stockholder of the Company, was a stockholder of the Company at the time of the Individual Defendants' wrongdoing as alleged herein, and has continuously been a stockholder of the Company since November 2018.

255. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

256.     As a result of the facts set forth herein, Plaintiff has not made any pre-suit demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

257.     The Board currently consists of eight (8) directors: defendants Chess, Chan, Crandell, Johannessen, Leproust, Ragusa, and Starovasnik, and non-party Trynka Shineman Blake.  A derivative plaintiff need only demonstrate reason to doubt that half of the directors are disinterested or objective in order to establish pre-suit demand excusal. Plaintiff has adequately alleged that there is reason to doubt that at least four (4) current directors of Twist are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

> ### A.     Demand Is Excused as to Defendants Leproust, Chan, Chess, Crandell, Johannessen, Ragusa, and Starovasnik, Because They Were Aware of the Serious Misconduct Alleged in the Securities Action and the Scorpion Report and Failed to Act

258.     Board records, produced to Plaintiff via his inspection demand pursuant to §220, have confirmed ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

259.     For example, the Individual Defendants continually received updates regarding ████████████████████████████ at Board meetings during the Relevant Period.[61] One of these updates was even delivered by ████████ ████████████████████████████████

---

[61] ████████████████████ ████████████████ ████████████████ ████████████████
████████████████████████████████████████████████████████████████
████████

in the allegations regarding inflated gross margin in the Securities Complaint, as he allegedly directed Twist employees to tag costs as R&D instead of cost of revenue. Additionally, some of these updates also included ██████████████████████████████████████████

260.    Additionally, after the Board received an update regarding ██████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████

261.    Moreover, some of the minutes of meetings of the Board during the Relevant Period even directly referenced ██████████████████████████████████ For example, ████████████████████ meeting of the Board, ████████████████████████████████ ████████████████████ the Board received an update ████ ██████████████████████ ████████████████████████████████████████████████

262.    Subsequently, at the ██████████ meeting of the Board, ██████████████████ ███████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Additionally, at this Board meeting, the Board members also were informed ██████████████████████████

---

62  ██████████████████ ████████████████ ██████████████████ ████████████████
    ██████████████████████████

63  ████████████████████

64  ████████████████████

65  ████████████████████



263.    Then, at the ▮▮▮▮▮ meeting of the Board, ▮▮▮▮▮ ▮▮▮▮▮ the Board received a report ▮▮▮▮▮

264.    The only references in the Production to actions by the Board ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮ Yet, nothing in the Production ▮▮▮▮▮ ▮▮▮▮▮ In fact, there is nothing in the Production ▮▮▮▮▮

265.    Based on the Production, Plaintiff alleges that a majority of the current Board members – defendants Leproust, Chan, Chess, Crandell, Johannessen, Ragusa, and Starovasnik -- ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮

266.    Given their actual knowledge and the red flags the Board materials raised, demand is futile for defendants Leproust, Chan, Chess, Crandell, Johannessen, Ragusa, and Starovasnik, a majority of the current Board members.

---



66  ▮▮▮▮▮

67  ▮▮▮▮▮

68  ▮▮▮▮▮

**B. A Majority of the Board Members Face a Substantial Likelihood of Liability for Knowingly Issuing False and Misleading Statements to Stockholders, Including SEC Filings They Signed**

267. Defendants Leproust, Chan, Chess, Crandell, Johannessen, Ragusa, and Starovasnik face a substantial likelihood of liability for their individual misconduct. Each of them served as a director of Twist during a portion or the entirety of the Relevant Period, and caused and/or permitted the Company to publish the false and misleading statements cited herein. As such, each of them had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

268. As alleged above, in sustaining the Securities Action in significant part, Judge Lee concluded that the Securities Complaint adequately alleged that investors were misled based on certain Product Statements (statements regarding Twist's production, manufacturing, and product capabilities) during the Class Period, as well as Financial Metrics Statements (statements about Twist's financial metrics and results). Certain of those false and misleading statements were contained in the Company's Annual Reports on 10-K filed with the SEC during the Relevant Period, some or all of which were signed by defendants Leproust, Chan, Chess, Crandell, Johannessen, Ragusa, and Starovasnik.

269. Moreover, each of defendants Leproust, Chan, Chess, Crandell, Johannessen, Ragusa, and Starovasnik owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard allowed Twist to engage in the misconduct alleged in the Securities Action and the Scorpion Report, and reviewed, authorized, and/or caused the

publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

270. Each of defendants Leproust, Chan, Chess, Crandell, Johannessen, Ragusa, and Starovasnik knowingly and/or recklessly allowed Twist to engage in the misconduct alleged in the Securities Action and the Scorpion Report, made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence. These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Individual Defendants face a substantial likelihood of liability. If the current members of the Board were to bring a suit on behalf of Twist to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to defendants Leproust, Chan, Chess, Crandell, Johannessen, Ragusa, and Starovasnik.

### C.     Defendant Leproust Is Interested and Lacks Independence

271. Defendant Leproust is incapable of independently considering a demand to commence and vigorously prosecute this action because her principal professional occupation is her employment as CEO of the Company. As such, the Company's most recent Annual Proxy Statement explicitly states that defendant Leproust is not independent.

272. Further, defendant Leproust is incapable of disinterestedly considering a demand to commence and vigorously prosecute this action because she faces additional substantial likelihood of liability as she is a named individual defendant in the partially-sustained Securities Action.  In the Securities Action, Judge Lee concluded that there is "***a strong inference of scienter***"

98

as to defendant Leproust, and found "***a strong inference that Leproust was at least reckless as to the allegedly false Product Statements***."

273.    Accordingly, defendant Leproust is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.

## COUNT I
### Breach of Fiduciary Duty Against the Individual Defendants

274.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

275.    The Individual Defendants, as current or former Twist officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

276.    By virtue of their positions as Twist directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

277.    Each Individual Defendant was required to: (a) use his or her ability to control and manage Twist in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Twist rather than his or her own interests.

278.    By their acts alleged herein, including but not limited to causing Twist to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

279.    The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

280. Twist has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

## COUNT II
### Unjust Enrichment Against the Individual Defendants

281. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

282. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Twist.

283. Plaintiff, as a stockholder and representative of Twist, seeks restitution from the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT III
### Against the Individual Defendants for Violations of § 10(b)
### of the Exchange Act and Rule 10b-5

284. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

285. The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

286. The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

287.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

288.    The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of Twist were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

289.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Twist, their control over, and/or receipt and/or modification of Twist's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Twist, participated in the fraudulent scheme alleged herein.

290.    As a result of the foregoing, the market price of Twist common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Twist common stock in purchasing Twist common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

291.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the

now-partially sustained Securities Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the partially sustained Securities Action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.       Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.       Directing Twist to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

C.       Awarding to Twist restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.       Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.       Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.


Dated: November 20, 2025

**RIGRODSKY LAW, P.A.**


*/s/ Gina M. Serra*
Seth D. Rigrodsky (# 3147)
Gina M. Serra (#5387)
Herbert W. Mondros (#3308)
1007 Orange Street, Suite 453
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
Email: gms@rl-legal.com
Email: hwm@rl-legal.com

*Attorneys for Plaintiff*

OF COUNSEL:

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: rusty@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: brett@shumanlawfirm.com

**POMERANTZ LLP**
Gustavo F. Bruckner
Samuel J. Adams
Ankita Sangwan
600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: gfbruckner@pomlaw.com
Email: sjadams@pomlaw.com
Email: asangwan@pomlaw.com